LINCOLN E. SMITH vs. CITY OF BOSTON.

Suffolk. October 5, 1992. - November 5, 1992.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & GREANEY, JJ.

*Municipal Corporations*, Officers and employees. *Public Employment*,
Termination. *Civil Rights*, Termination of employment, Availability of
remedy.

Discussion of cases setting forth the circumstances under which the uncon-
stitutional act or acts of a government official may be attributable to a
municipality for purposes of imposing municipal liability under 42
U.S.C. § 1983 (1982). [610-612]

An employee of the city of Boston, who had recovered compensatory and
punitive damages for violations of his civil rights by the city's director
of personnel, did not demonstrate that the personnel director's unconsti-
tutional acts were attributable to the city for the purposes of imposing
municipal liability under 42 U.S.C. § 1983 (1982), where the acts were
abuses of discretion that did not represent official policy either directly
or by delegation or through ratification. [612-618]

CIVIL ACTION commenced in the Superior Court Depart-
ment on December 3, 1987.

The case was tried before *Mel L. Greenberg*, J.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Paul L. Nevins* (*Philip R. Olenick* with him) for the
plaintiff.

*Susan M. Weise*, Assistant Corporation Counsel (*Gerard
A. Pugsley*, Assistant Corporation Counsel, with her) for the
defendant.

NOLAN, J. For the first time we consider whether a munic-
ipal corporation is liable under 42 U.S.C. § 1983 (1988) for

an unconstitutional act of one of its officials.[1] On the facts presented, we agree with the allowance of the motion of the city of Boston (city) for a directed verdict.

From 1977 to 1980, the plaintiff, Lincoln E. Smith, worked as an administrative assistant to a member of the city council (city councillor). From 1982 through June, 1986, Smith was employed as the coordinator of the student employment program by the city. In April, 1986, the mayor of Boston appointed Robert W. Consalvo as director of the office of personnel management for the city of Boston (director).[2] Consalvo's appointment became effective June 1, 1986, but he immediately assumed the duties and responsibilities of the position. As director, Consalvo was "responsible for the personnel actions of all the [city] employees except those in the school department."[3] Consalvo testified that his primary responsibility was the "hiring and firing" of employees and "the procedures dealing with personnel policy and the like."

Almost immediately after Consalvo became director he began to "harass" Smith because of Smith's association with a city councillor. Consalvo's "harassment" escalated to disparate treatment and intimidation.[4] On June 23, 1986, less than one month after his appointment as director became effective, Consalvo fired Smith.[5] Following termination, Smith

[1]The Appeals Court has, however, touched on the issue. See *Ossinger* v. *Newton*, 26 Mass. App. Ct. 831, 833-834 (1989).

[2]Consalvo's position is also referred to as supervisor of personnel.

[3]Consalvo testified that the mayor had hired him "to take over [the] department and restructure it into a modern office of personnel management."

[4]Smith testified that on one occasion Consalvo said to him, "If [the city councillor] wants you employed by the City of Boston, it is not going to be in this department. I suggest that you look elsewhere."

As for the disparate treatment, Smith testified that Consalvo moved him from his North Street office to City Hall, required Smith to submit daily activity reports not required of other employees, and challenged Smith's attendance record.

[5]Consalvo asserted that he properly fired Smith for failing to turn in a daily report on Friday, June 20. Smith testified, however, that he prepared the report in the late afternoon and went to Consalvo's office to turn it in at 4:46 P.M. Outside Consalvo's office, Smith said he was met by one of

requested a meeting with the mayor. The meeting was held on June 30, 1986. Smith, Consalvo, the mayor, and the city councillor were present. Smith testified that he recounted at the June 30 meeting the circumstances leading to his termination. Smith further testified that the mayor said "that things would be taken care of," and that "he [the mayor] knew exactly where [Smith] was coming from." Smith testified that the mayor promised to get back in touch with him. The mayor responded by way of his executive assistant who told Smith that "there was a position available at the Boston police department in the personnel unit," and that they would transfer him if he applied for the position.

Thereafter, Smith brought suit against Consalvo, individually and in his capacity as director of personnel, and the city claiming, pursuant to 42 U.S.C. § 1983, and G. L. c. 12, § 11I (1990 ed.), that Consalvo and the city violated his right to be free of reprisals for political association and affiliation guaranteed by the Massachusetts Declaration of Rights and the United States Constitution. At trial, following presentation of the plaintiff's case-in-chief, the trial judge granted the city's motion for a directed verdict on the State and Federal civil rights claims.[6] The matter of Consalvo's individual liability was submitted to the jury. On a special verdict, the jury found that Consalvo violated Smith's civil rights secured by the Massachusetts Declaration of Rights and the United States Constitution, and awarded Smith

Consalvo's administrative assistants, who informed Consalvo of Smith's arrival and reported back to Smith that Consalvo would be with him shortly.

After waiting until 5:30 P.M. for Consalvo to come out of his office and accept the report, Smith departed for the weekend and left the report on his own desk. On Monday morning, June 23, 1986, Consalvo summoned Smith into his office and terminated him for failing to turn in the activity report.

[6]The judge also granted the city's motion for a directed verdict on Smith's claims that the city violated its contract with him and negligently failed to prevent Consalvo from engaging in the described course of conduct, and Consalvo's motion for a directed verdict on Smith's claims of intentional infliction of emotional distress and interference with advantageous relations.

$137,000 in compensatory damages and $5,000 in punitive damages. Consalvo is not a party to this appeal.

Smith now appeals from the judge's grant of a directed verdict on the Federal civil rights claim brought against the city asserting, in essence, that Consalvo's unconstitutional act is attributable to the city.[7] In pressing this appeal Smith seeks reinstatement to his prior position. We transferred the matter from the Appeals Court on our own motion.

On the basis of *Monell* v. *Department of Social Servs. of the City of N.Y.*, 436 U.S. 658 (1978), and its progeny, we conclude that Smith has failed to demonstrate that Consalvo's unconstitutional acts are attributable to the city for the purposes of imposing municipal liability under 42 U.S.C. § 1983. Accordingly, we affirm the judge's grant of a directed verdict on the § 1983 count.

The starting point for our discussion is § 1983. It provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ." In *Monell* v. *Department of Social Servs. of the City of N.Y.*, *supra* at 663, the United States Supreme Court first held that local government units were "persons" as that term is used in 42 U.S.C. § 1983. This decision rendered municipalities amenable to suit under § 1983 for wrongs caused through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by that municipality. *Id.* at 690. Not limiting its pronouncement to formal acts of government, the *Monell* Court stated that § 1983 authorizes suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a cus-

---

[7]Smith's notice of appeal also included a reservation of the judge's grant of a directed verdict on the State civil rights claim. Smith, however, failed to raise the argument in his brief and has presumably abandoned this claim. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

tom ha[d] not received formal approval through the body's official decisionmaking channels." *Id.* at 690-691.

Further defining the reach of municipal liability under § 1983, the *Monell* Court rejected respondeat superior as a basis of imposing liability on a municipality for the unconstitutional act or acts of one of its officers or employees.[8] The *Monell* Court stated that a municipality could be held liable only when its "lawmakers or those whose edicts or acts may fairly be said to represent official policy" cause the constitutional harm. *Id.* at 694.

Following *Monell*, the Supreme Court set out to clarify the circumstances under which an act or acts of a government official represent official policy. See *Blum, Monell, DeShaney*, and *Zinermon*: Official Policy, Affirmative Duty, Established State Procedure and Local Government Liability Under Section 1983, 24 Creighton L. Rev. 1, 15-23 (1990). In *Pembaur* v. *Cincinnati*, 475 U.S. 469, 480 (1986), a plurality of the Court stated that "municipal liability may be imposed for a single decision by [a] municipal policymaker [ ] under appropriate circumstances." One of the appropriate circumstances cited was the instance where "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481. The question whether a decision maker possesses "final policy

---

[8]The *Monell* Court noted that the primary basis for its conclusion was the legislative history of the act which disclosed that Congress questioned "its constitutional power to impose such liability in order to oblige municipalities to control the conduct of others." See *Pembaur* v. *Cincinnati*, 475 U.S. 469, 479 (1986), citing *Monell* v. *Department of Social Servs. of the City of N.Y.*, 436 U.S. 658, 665-683 (1978).

Additional support for the proposition that § 1983 could not be interpreted to impose vicarious liability on a local governmental unit is the language of the statute itself. See 42 U.S.C. § 1983 (statute imposes liability only on a person who "subjects or causes to be subjected" any individual to a deprivation of Federal rights). See also *Monell* v. *Department of Social Servs. of the City of N.Y.*, *supra* at 692.

making authority," the Court stated, is a question of State
law.[9] *Id.* at 483.

In *St. Louis* v. *Praprotnik*, 485 U.S. 112, 127 (1988), the
Court stated: "When an official's discretionary decisions are
constrained by policies not of that official's making, those
policies, rather than the subordinate's departures from them,
are the act of the municipality. . . . If the authorized policy-
makers approve a subordinate's decision and the basis for it,
their ratification would be chargeable to the municipality
. . . ."

Based on these developments in the Supreme Court's line
of post-*Monell* decisions, Lincoln Smith, the plaintiff here,
advances three theories under which Consalvo's unconstitu-
tional acts are attributable to the city for the purposes of
establishing § 1983 liability. First, Smith argues that Con-
salvo, as director, possessed "final policymaking authority."
Second, Smith argues that the mayor's alleged delegation of
"policy making authority" to Consalvo necessarily consti-
tuted de facto municipal policy having the force and effect of
law. Third, Smith argues that, if Consalvo did not possess
final policy making authority, the mayor ratified Consalvo's
decision by his actions taken subsequent to the termination.
We take up each argument in turn.

Smith asserts that Consalvo, as director, was the official
responsible for establishing final policy with respect to per-
sonnel matters in the city and therefore Consalvo's acts are
attributable to the city. While we have little difficulty con-
cluding that Consalvo's position comes with trappings of au-
thority and discretion as to matters of a managerial nature,
we see no basis for the conclusion that the director (or super-
visor) of personnel possesses final policy making authority
with regard to the complained-of actions. We conclude that
the director (or supervisor) of personnel is bound by policies
enunciated by the mayor, and as such, these policies, and not

---

[9]In *St. Louis* v. *Praprotnik*, 485 U.S. 112, 124 n.1 (1988), the Court
noted that State law may include State and "local positive law as well as
custom or usage having the force of law."

Consalvo's abusive departure from them, serve as our bench-mark for determining municipal liability.

We find support for our conclusion in the Revised Ordi-nances of the City of Boston. They present the mayor as the chief executive officer supported, in the administration of government, by the administrative services board (board). City of Boston Code, Ordinances, Title 5, § 5-1.1 (as amended, 1991) (amendments not germane for purposes re-ferred to herein). The board is under the charge of the direc-tor of administrative services who serves as the chairman of the board. *Id.* at §§ 5-1.1, 5-1.2. The supervisor of personnel serves as a board member under the director of administra-tive services. *Id.* at §§ 5-1.1, 5-1.6.

The ordinances describe the duties of the director of ad-ministrative services as one who is to "make, under the Mayor, studies and *recommendations* with respect to the or-ganization, activities, policies and procedures of all Depart-ments, Boards and officers so that the administration thereof shall be economical and efficient" (emphasis added). *Id.* at § 5-1.2. Thus, even the director of administrative services, who chairs the board overseeing the function of numerous departments, including Consalvo's, is not empowered to make final policy but merely makes recommendations to the mayor. Further, the duties of the supervisor of personnel de-scribed in the ordinances do not include responsibility for es-tablishing final policy with respect to personnel matters.[10]

---

[10]In pertinent part, § 5-1.6 of the revised ordinances describes the duties of the supervisor of personnel: "The Supervisor of Personnel shall: a. Es-tablish and maintain personnel records, as complete as practicable, for all persons in the service of the City; b. Make a continuing study of personnel problems, employment conditions and economic changes affecting the sev-eral departments of the City; c. Recommend, from time to time to the Mayor and the several officers appointing subordinates, programs designed to provide opportunities for career service within the City and administra-tive policies tending to improve and coordinate the handling of personnel matters . . . ; and d. Supervise the administration of all compensation plans established for employees of the City and recommend such changes in those plans as from time to time shall seem to him necessary or advis-able . . . ."

Given this organizational structure, it is clear that the mayor, not the director (or supervisor) of personnel, is the final policy making authority. While not completely outside the inner circle of policy makers, the director of personnel's policy making role is, at most, an advisory one.

Our conclusion is supported by the numerous executive orders and policy statements issued by the mayor's office governing personnel matters presented at trial.[11] One such document is the Executive Employment Policy Manual (manual) adopted by executive order of the mayor, March 9, 1983. Section I(D) of the manual sets forth the city's general employment policy: "The Affirmative Action goals of the City of Boston are to provide fair and equal employment opportunities for employees and applicants for employment on the basis of individual merit and fitness as ascertained through fair and practical methods of selection and promotion . . . with proper regard for their . . . constitutional rights as citizens." Section I(B) of the manual, entitled "Coverage of this Policy," provides that "[a]ny changes to said plan must be approved by the Mayor . . . *and* the Supervisor of Personnel" (emphasis supplied).

Further, the manual provides at various points that the supervisor of personnel is responsible for administering, maintaining, reviewing, and implementing various aspects of the personnel management plan. See, e.g., *id.* at § III(B). Indeed, the responsibilities of the supervisor of personnel delineated at various points in the manual belie the conclusion that one occupying the position possesses final policy making authority with regard to personnel matters and support the city's claim that someone other than Consalvo possessed final policy making authority with regard to these matters.

While the responsibilities of the supervisor of personnel as detailed in the ordinances and other city documents considered fail to describe one vested with final policy making au-

---

[11]Noteworthy is the absence of any policy statement or memorandum issued by Consalvo purporting to be a final policy statement on a relevant subject.

thority, our conclusion here is based only on positive local law. The question whether Consalvo possessed final policy making authority as a matter of practice, or through custom and usage, is next considered.

For his second theory, Smith argues that the mayor delegated final policy making authority to Consalvo at the time Consalvo was appointed. Smith asserts that this delegation rendered the city liable for Consalvo's act because Consalvo's decision to terminate Smith necessarily constitutes "policy," despite the fact that Consalvo's practice was not authorized by law. Generally, Smith relies on the principle that the mayor's delegation and Consalvo's subsequent action constitute "custom and usage," having the force and effect of law thereby exposing the city to liability for Consalvo's actions.

In support of this proposition, Smith points to the conversation Consalvo had with the mayor at the time of his appointment and Consalvo's trial testimony. The mayor, in Consalvo's words, said that he had hired Consalvo to take over that office and "restructure it into a modern office of personnel management." Consalvo testified that he understood that he was "responsible for the personnel actions of all of the employees . . . and . . . the hiring and firing and the procedures dealing with personnel policy and the like." Further, Consalvo testified that he was not required to follow the previous director's policies and regulations in running the office.

Municipal liability for governmental custom or practice falling short of a formal government act under § 1983 is well established, see *Monell* v. *Department of Social Servs. of the City of N.Y.*, 436 U.S. 658, 690-691 (1978), but Smith misconstrues its application. Governmental custom does not go to the propriety of a delegation of decision making authority, but rather to the existence of a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *St. Louis* v. *Praprotnik*, 485 U.S. 112, 127 (1988), quoting *Adickes* v. *S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970).

To carry the day on the "custom" argument, the plaintiff must establish a pattern of occurrences or a practice similar to that experienced by him, but not necessarily induced by Consalvo, so as to rise to the level of custom thereby having the force and effect of law. Smith has cited no incidents that support such a conclusion. Smith cites only the language of the mayor's instruction: a charge that arguably does not extend beyond the scope of responsibilities defined in the city ordinances and the manual.[12] Accordingly, we conclude that Consalvo's hiring and firing authority was constrained by overarching municipal policies. See *St. Louis* v. *Praprotnik, supra* at 127. Consalvo's decision to terminate Smith was an abuse of discretion failing to rise to the level of governmental custom or practice having the force and effect of law.

Corollary to the second theory, Smith advances the argument that a failure to hold the city liable in this instance will lead to "egregious attempts by local governments to insulate themselves from liability" by allowing, and perhaps encouraging, subordinates to carry out unconstitutional acts. *St. Louis* v. *Praprotnik, supra* at 127. While this argument does have appeal, the argument must fail. First, for the reasons noted above, egregious attempts by a municipality to avoid liability are actionable as de facto municipal policy (custom or usage) having the force and effect of law. *Id.* Second, imposing liability on the municipality for what we view as an abuse of discretion would, without more, be virtually indistinguishable from respondeat superior, a basis of § 1983 lia-

---

[12]Smith relies on Consalvo's statement that, in assuming the position, he was not required to follow the previous director's "policies and regulations." Smith reads this use of the term "policies" as vesting final policy making authority in Consalvo. Smith's interpretation bears little resemblance to the context in which the remark was made and the mayor's motivation for hiring Consalvo. The mayor appointed Consalvo to restructure the office of personnel management, an office that lacked modern efficiency. The administrative problems which existed in the office were presumably, at least in part, attributable to the manner in which Consalvo's predecessors managed the office. It is more likely, in our view, that the term "policies and regulations" in this context referred to "department policy" and concerned departmental procedures and administrative practices.

bility that the Supreme Court of the United States has rejected.

On his third theory, Smith argues that the mayor ratified Consalvo's unconstitutional acts in failing to overrule them after he was advised of their occurrence at the meeting on June 30. We find no merit to this argument.

We assume for the purposes of discussion that Consalvo's act would be attributable to the city if the mayor is found to have ratified Consalvo's decision. We note that Smith produced no evidence showing that the mayor approved of Consalvo's decision and the basis for it prior to Smith's termination. The only evidence tending to support this ratification theory is Smith's description of the circumstances leading to his termination at the June 30 meeting and the mayor's subsequent promise "that things would be taken care of." Assuming, for the moment, that the correct point in time for inquiry is after termination,[13] the record does not support the conclusion that the mayor ratified Consalvo's decision and the basis for it. The circumstances lead us to the conclusion that the mayor, at most, acquiesced in Consalvo's decision. Mere acquiescence in a subordinate's decision will not subject the municipality to liability because the governmental policy itself causes the violation.

In conclusion, we cannot say that Consalvo's acts are attributable to the city under 42 U.S.C. § 1983. Smith failed to show that Consalvo possessed final policy making authority with respect to the complained-of activities and failed to demonstrate the existence of a municipal policy, express or implied, that caused the constitutional harm. The authority to act for the city does not necessarily grant license to establish final policy. Responsibility for Consalvo's acts, deplorable as they were, rests squarely on his own shoulders. We recognize that Consalvo's illegal acts cost Smith his job, but relief against the city is beyond our grasp on the grounds

---

[13]We express no opinion on the issue whether ratification must occur before the complained-of act occurs. See *Looney* v. *Wilmington*, 723 F. Supp. 1025, 1036-1037 (D. Del. 1989).

asserted. Accordingly, we find no error in the trial judge's grant of the city's motion for a directed verdict on the Federal civil rights claim.

*Judgment affirmed.*