# DECISIONS

OF THE

## SUPREME JUDICIAL COURT

OF

## MASSACHUSETTS

---

CLIFFORD J. MARTIN *vs.* SIMMONS PROPERTIES, LLC.

Suffolk. September 9, 2013. - January 16, 2014.

Present: IRELAND, C.J., SPINA, CORDY, GANTS, DUFFLY, & LENK, JJ.

*Real Property,* Registered land: easement, Easement, Certificate of title, Deed, Drain. *Easement. Deed. Way,* Private: extent. *Drain.*

This court concluded that the owner of a servient parcel of land may, in light of the court's earlier adoption of the Restatement (Third) of Property (Servitudes) § 4.8(3) (2000) (permitting a servient parcel owner's relocation of an easement), modify the dimensions of an easement burdening the parcel, so long as the easement continues to serve its intended purpose [8-12]; further, this court concluded that no meaningful distinction existed between such an easement on recorded land and an easement on registered land [12-13]; accordingly, a Land Court judge correctly ruled that certain encroachments into an easement defined by reference to a Land Court plan of registered land did not interfere with the plaintiff easement holder's rights to passage over the easement, in that the encroachments did not lessen the easement's utility for passage by vehicles much larger than any in existence at the creation of the easement, did not increase the burden on the plaintiff in his use of it, and did not frustrate the purpose of travel to the plaintiff's lot [13-17].

In a civil action brought in the Land Court claiming, inter alia, a right of passage over an area shown on a Land Court plan of registered land that did not indicate the existence of such a right, there was no error in the judge's conclusion that the plaintiff failed to establish any easement rights over the disputed area. [17-19]

In a civil action brought in the Land Court claiming, inter alia, that the right of the defendant owner of registered land to travel over an easement benefiting the defendant's land, as shown on a Land Court plan, had been extinguished by abandonment, there was no error in the judge's conclusion that the defendant's easement continued to exist. [19-20]

In a civil action brought in the Land Court alleging, inter alia, that the placement of fill on the defendant's parcel of registered land had interfered with the plaintiff's easement rights in certain ways on the land, there was no error in the judge's conclusion that the defendant had no obligation to remove the fill, where the plaintiff failed to establish that the defendant had placed the fill, the extent of any change in elevation as a result of the fill, or the impact of any such change. [20-21]

In a civil action brought in the Land Court claiming, inter alia, interference by the defendant owner of registered land with the plaintiff's easement rights to use certain storm drains, sewer pipes, sprinkler pipes, and water pipes located within easements set forth in his certificate of title and shown on a Land Court plan, although the judge should not have treated the claims as time-barred under the tort statute of limitations, there was no error in the judge's conclusion that the defendant had no obligation to restore the storm drains to their locations as shown on the Land Court plan and that the plaintiff bore the cost of any necessary restoration or maintenance; nor was there error in the judge's conclusion that the plaintiff could not require the defendant to bear any costs of restoring the plaintiff's ability to use the water and sprinkler pipes. [21-23]

CIVIL ACTION commenced in the Land Court Department on August 3, 2007.

The case was heard by *Gordon H. Piper*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Clifford J. Martin*, pro se.

*Joseph P. Mingolla* for the defendant.

*Martin J. Newhouse & John Pagliaro*, for New England Legal Foundation & another, amici curiae, submitted a brief.

*Diane C. Tillotson*, for Real Estate Bar for Massachusetts & another, amici curiae, submitted a brief.

LENK, J. In this case involving registered land, we consider, among other things, the effect of a reduction by the owner of the servient estate in the dimensions of an easement created for the purpose of permitting the easement holder access to a lot that

otherwise has no direct access from a public way. We must determine whether the dimensions of such an easement, defined by reference to a Land Court plan, may be modified by the servient land holder so long as the purposes for which the easement was created are not frustrated, and the utility of the easement is not lessened.[1] We conclude that there is no meaningful distinction for purposes of such an analysis between an easement on recorded land and an easement on registered land held pursuant to a Land Court certificate of title. Confirming and expounding upon our adoption of the Restatement (Third) of Property (Servitudes) § 4.8(3) (2000) (Restatement) in *M.P.M. Bldrs., LLC* v. *Dwyer*, 442 Mass. 87 (2004) (*M.P.M. Builders*), we affirm the decision of the Land Court judge that the width of the easement properly may be reduced as the defendant has done here, since the plaintiff does not dispute that at all times he has been able to use the remaining unobstructed portion of the easement for the purpose of travel to and from his parcel.

1. *Background and prior proceedings.* We recite the facts based on the detailed findings of the trial judge. For the most part, the facts are undisputed. In 1969, Clifford J. Martin purchased a parcel of land of approximately one-third acre on the Medford-Somerville line, in an industrial-commercial district. Like all the lots on that block, Martin's title to the parcel is held under a transfer certificate of title issued by the Land Court when the property was divided and title was transferred from single ownership. The parcel, known as 200-R (rear) Boston Avenue, and designated lot 3A on Land Court Plan No. 6199J (J-Plan), was registered by the Land Court in 1940, when the J-Plan was created;[2] the parcel abuts the Boston and Maine Railroad to the northeast, and has no direct access to a public way. When Martin

---

[1] We acknowledge the amicus brief of the New England Legal Foundation and NAIOP Massachusetts in support of Simmons Properties, LLC (Simmons), and the amicus brief of the Real Estate Bar for Massachusetts and The Abstract Club.

[2] The "J-Plan" shows the separate parcels created along a one-block length of Boston Avenue after the division of a larger property that had been held by the Textile Realty Company. The J-Plan was approved by the Land Court in December, 1940, after the August, 1940, conveyance of lot 3A from the Textile Realty Company to Peter Boscho, a predecessor in interest to Clifford J. Martin, and of lots 4A, 10, and 12 to the Russell Box Company, a predecessor in interest to Simmons. As at issue here, the J-Plan denotes five rights of way, desig-

acquired lot 3A, it was occupied by a three-story, wooden structure containing heavy equipment; that building burned to the ground in 1991. Since that time, other than to move some fill and debris into the foundation hole of the burned building, Martin has not made use of the property, which has remained vacant.

According to the transfer certificate of title, lot 3A is "subject to and has the benefit of" eight easements, including an easement for travel over lots 4A, 10 and 12[3] (Way A) as indicated on the J-Plan. Way A runs northeast from Boston Avenue, a public way, to the property line of the Boston and Maine Railroad, passing between the buildings numbered 196 Boston Avenue on lot 4A and 200 Boston Avenue on lot 10. Way A is bounded to the north by lots 9 and 4A, and to the south by lots 1B, 10, and 12. At the southwest corner of a now-demolished building shown on the J-Plan, which was attached to the building now standing at 196 Boston Avenue, Way A takes a ninety-degree turn to the north, where it meets the southern boundary of lot 3A. The width of Way A as shown on the J-Plan fluctuates along its length. In its current configuration, with the acknowledged encroachments, Way A is twenty-eight feet wide at the entrance from Boston Avenue and is at no point along its length less than nineteen feet in width. Lot 3A is benefited also by a number of other easements pertaining to sewer pipes, sprinkler pipes, water pipes, other utility pipes, and storm drains.

Three of the lots over which Way A extends, lots 4A, 10, and 12, were also issued certificates of title by the Land Court in 1940, following a conveyance that year by the Textile Realty Company to the Russell Box Company. See note 2, *supra*. Lot 4A is to the southwest of lot 3A, and lots 10 and 12 are to the southeast of lot 4A. Simmons Properties, LLC (Simmons), has held title to these lots, as well as to lot 1A, to the southwest of lot 4A, since 1993. When Simmons acquired its parcels, a large

---

nated Ways A, B, C, D, and E, all abutting or on lots 3A and 4A; only Ways A and E are at issue here. Lot 4A enjoys "[a] right in common with lot 3A . . . over rights of way 'A', 'B', 'C', and 'E' shown on [the J-Plan]." Each of Ways A, B, C, D, and E are indicated on the J-Plan by "hatching" (thin, parallel lines drawn at an angle to the boundaries of the way). A copy of the relevant portion of the J-Plan is attached as an Appendix.

[3]In 1991, lots 10 and 12 merged and are now known as lot 20. As do the parties, we refer to them by the earlier designations shown on the J-Plan.

primary building (196 Boston Avenue) stood on lot 4A, with two square, smaller buildings attached to the larger structure. Sprinkler pipes and sewer pipes in the basement of the northeast building ran underground and into the basement of the three-story wooden building which stood on lot 3A, where they connected to pipes in that building.

Lot 4A is benefited (as is lot 3A) by an easement designated Way E on the J-Plan, which intersects with Way A; this easement runs northwest along the northern boundary of lot 4A and the southern boundary of lot 3A. According to the J-Plan, most of Way E is located on lot 3A, although a portion of Way E is located on lot 4A. At the time of its approval by the Land Court in 1940, and as shown on the J-Plan, Way E was covered in part, but not completely, by a raised wooden platform; that platform no longer exists.

Immediately after its acquisition of lots 4A, 10, and 12, Simmons made a number of alterations to these parcels. It demolished the two smaller buildings, indicated on the J-Plan, that had been attached to the building now known as 196 Boston Avenue. It also refurbished the buildings at 196 and 200 Boston Avenue. At 196 Boston Avenue, Simmons installed an entrance foyer adjacent to an elevator shaft that has been attached to the building since before 1940,[4] and installed a depressed loading dock adjacent to the elevator shaft. At 200 Boston Avenue, Simmons installed a depressed stairwell with a canopy and handrail, created marked parking spaces running along the building, and installed a parking deck on lot 12. Simmons also placed fill along Way A and resurfaced it with asphalt, altering its grade and covering certain storm drains, indicated on the J-Plan, that had existed previously. It is undisputed that all of these improvements protrude to some extent into Way A.

In August, 2007, Martin, acting pro se, filed a complaint in the Land Court asserting fifteen separate acts of encroachment upon or ongoing acts of interference with his right to use the easement over Way A, as well as interference with the various sewer, water, sprinkler, utility, and storm drain easements appurtenant to lot 3A. In addition to the encroachments placed in Way A by Sim-

---

[4]The elevator shaft is indicated on the J-Plan, and protrudes into Way A on that plan.

mons's 1993 renovations of the buildings at 196 and 200 Boston Avenue, Martin challenged the placement of curbing and landscaping at the entrance to Way A where it meets Boston Avenue and along its length, the placement of utility poles near the entrance from Boston Avenue, and the placement of fill along Way A, on lot 3A, and on an area adjacent to Way E known as the "unhatched area."[5] He maintained that Simmons had interfered with his rights to use the storm drains by paving over the drains indicated on the J-Plan and relocating them elsewhere on its parcels, and interfered with his rights to use the sewer pipes, sprinkler pipes, and water pipes by dismantling or destroying the connections that ran from the former wooden structure on lot 3A to those pipes when it demolished the two smaller buildings on lot 4A. He claimed also that he had a right of passage over the "unhatched area," a portion of land belonging to Simmons, south and east of Way E, and that Simmons's right of passage over Way E had been extinguished.

In 2008, Martin and Simmons filed cross-motions for summary judgment. After a hearing in July, 2008, a Land Court judge, who was also the trial judge, allowed in part and denied in part each of the parties' motions in January, 2009.[6] Following a two-day trial in August, 2009, the judge took a view of the locus. Four witnesses testified at trial; Martin testified on his own behalf and introduced testimony by Marc Knittle, leasing property manager for Cummings Properties, an affiliate of Simmons. Simmons offered testimony by Dennis Clarke, president and chief executive officer of Cummings Properties, and Richard Benevento, a traffic engineering expert and chairman of the parking and traffic commission for the city of Beverly.

The judge suspended closing arguments in order to allow both sides to file posttrial memoranda and proposed findings of fact and rulings of law (including a late filing by Martin to which Simmons subsequently filed a response). Closing arguments ultimately took place in December, 2009, and in April, 2011, the

---

[5] The "unhatched area" is bordered by Way E to the north, by the building at 200 Boston Avenue to the south, by land of the Boston and Maine Railroad to the east, and by Way A to the west.

[6] At a pretrial conference in May, 2009, Martin's motion voluntarily to dismiss his claim concerning easement rights in a six-inch sewer pipe that had serviced the former building on lot 3A was allowed, and that claim was dismissed.

judge issued a detailed and thorough written decision, finding for Simmons on all claims.

The judge concluded that, although Simmons had made certain encroachments into Way A as a result of the work on the buildings at 196 and 200 Boston Avenue and other contemporaneous improvements to its parcels, and although other encroachments on Way A had existed before Simmons's acquisition of its lots, Way A "functions fully adequately for passage by all current trucks and other vehicles";[7] moreover, Martin conceded that at no time had he been unable to access lot 3A by traveling over Way A. Thus, Simmons had no present obligation to remove any of the encroachments. The judge found also that Martin had no easement rights over the unhatched area, as it was not indicated on the court-approved J-Plan, and no evidence had been introduced showing mutual mistake such as would support reformation of the plan. The judge concluded further that Simmons's rights to travel over Way E had not been extinguished due to the removal of the raised platform, nor had Simmons abandoned its rights to Way E through nonuse. The judge decided that Martin's claims concerning the fill on Way A were time barred and that he had not met his burden of establishing that Simmons had placed the fill or that it interfered with his use of Way A.[8] As to the storm drains, Martin was not entitled to require Simmons to remove the asphalt and fill placed over the drains indicated on the J-Plan, since his easement rights are for use of storm drains to remove water from lot 3A, and not to particular drains in a particular location. As to the sewer, sprinkler, and water pipes, the claims were both time barred, and although Martin was entitled to the use of these easements, Simmons had no liability for the costs, if any, necessary to restore Martin's ability to use the pipes.

Martin appealed, and the Appeals Court reversed the judgment in part, affirmed in part, and remanded for further findings on the question whether Simmons had adopted or maintained

---

[7]The judge credited Benevento's testimony that a travel lane of a city street averages ten to twelve feet in width, and that a travel lane on the Massachusetts Turnpike is eleven to twelve feet wide.

[8]The judge found also that the fill on the area south of Way E was entirely on Simmons's property, and formed no part of Way E, and that the claims for trespass on lot 3A by placement of fill there were time barred.

some of the encroachments, such as the entrance curbing and landscaping, that had been placed on Way A in 1987, before Simmons's 1993 acquisition of its parcels. *Martin* v. *Simmons Props., LLC*, 82 Mass. App. Ct. 403, 414 (2012). Without discussion of *M.P.M. Builders, supra,* the Appeals Court concluded that, because Martin's parcel is held under a Land Court certificate of registration, the dimensions of all easements appurtenant to it indicated on the J-Plan are immutable, and Martin has a right of access over the full width of Way A as shown on the J-Plan. *Martin* v. *Simmons Props., LLC, supra* at 408-409. The Appeals Court affirmed the judgment insofar as it concerned Martin's lack of any easement over the unhatched area, *id.* at 407, and Simmons's ongoing easement rights over Way E, *id.* at 414. The court also affirmed the judgment as to the fill and the other easements, but on grounds different from those relied upon by the trial judge. *Id.* at 412-414. We allowed Simmons's application for further appellate review. While we agree with the Appeals Court that Martin's claims concerning the fill, the storm drains, and the pipes should not have been analyzed under a tort statute of limitations, we affirm the judgment of the Land Court on all of Martin's claims.

2. *Discussion.* a. *Standard of review.* Upon appeal, we accept a trial judge's findings of fact unless they are "clearly erroneous," *Millennium Equity Holdings, LLC* v. *Mahlowitz,* 456 Mass. 627, 636 (2010), and do not review questions of fact if any reasonable view of the evidence and the rational inferences to be drawn therefrom support the judge's findings. *Id.* at 637, citing *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 510 (1997). We uphold the findings of a judge who saw and heard the witnesses unless we are of the "definite and firm conviction that a mistake" has been made. *Id.* at 637, quoting *Kendall* v. *Selvaggio,* 413 Mass. 618, 620-621 (1992). See *Brandao* v. *DoCanto,* 80 Mass. App. Ct. 151, 155, quoting *Demoulas* v. *Demoulas Super Mkts., Inc., supra* (finding cannot be clearly erroneous where there are two permissible views of evidence). Our review of a trial judge's conclusions of law, however, is de novo. *Trace Constr., Inc.* v. *Dana Barros Sports Complex, LLC,* 459 Mass. 346, 351 (2011).

b. *Easement rights.* "An affirmative easement 'creates a non-

possessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement.' " *Patterson* v. *Paul*, 448 Mass. 658, 663 (2007), quoting Restatement, *supra* at § 1.2(1). "The benefit of an easement . . . is considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose. The holder of the easement . . . is entitled to make only the uses reasonably necessary for the specified purpose. The transferor of an easement . . . retains the right to make all uses of the land that do not unreasonably interfere with exercise of the rights granted by the servitude." Restatement, *supra* at § 1.2 comment (d). See, e.g., *Butler* v. *Haley Greystone Corp.*, 352 Mass. 252, 258 (1967); *Ampagoomian* v. *Atamian*, 323 Mass. 319, 322 (1948); *Carter* v. *Sullivan*, 281 Mass. 217, 225 (1932); *Johnson* v. *Kinnicutt*, 2 Cush. 153, 156-157 (1848). Restrictions on land "are disfavored," *Patterson* v. *Paul*, *supra* at 662, and doubts concerning the rights of use of an easement "are to be resolved in favor of freedom of land from servitude." *Butler* v. *Haley Greystone Corp.*, *supra*.

c. *Martin's rights to use Way A.* Martin does not dispute that, as he testified at trial, he has at all times been able to pass over Way A to reach his lot, and Simmons has never suggested to him that he may not travel on Way A over its property. Nonetheless, Martin asserts that, because his easement rights are for the benefit of registered land, he is entitled to the use of the full extent of Way A as shown on the J-Plan that is incorporated in his deed. He contends that all of the encroachments now existing on Way A, whether placed there by Simmons or existing prior to Simmons's acquisition of its parcels in 1993, must be removed at Simmons's expense.

In *M.P.M. Builders*, *supra* at 91, we adopted § 4.8(3) of the Restatement, which provides:

> "Unless expressly denied by the terms of an easement, as defined in § 1.2, the owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement, at the servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not (a) significantly

lessen the utility of the easement, (b) increase the burdens on the owner of the easement in its use and enjoyment, or (c) frustrate the purpose for which the easement was created."

Restatement, *supra* at § 4.8(3). Observing that "[a]n easement is created to serve a particular objective, not to grant the easement holder the power to veto other uses of the servient estate that do not interfere with that purpose," we concluded that the "balanced" approach to easement rights set forth in the Restatement would best maximize the value of property to the owner of a servient estate while protecting the rights of an easement holder. *M.P.M. Builders, supra* at 91-92. We determined that adoption of § 4.8(3) of the Restatement would strike "an appropriate balance between the interests of the respective estate owners." *M.P.M. Builders, supra* at 91. Noting that certain of our prior cases had stated that an easement holder could not unilaterally relocate an easement, we concluded that the rule set forth in § 4.8(3) provides a "fair tradeoff for the vulnerability of the servient estate to increased use of the easement to accommodate changes in technology and development of the dominant estate," and permits a servient estate holder "to make the fullest use of his or her property allowed by law, subject only to the requirement that he or she not damage other vested rights holders." *Id.* at 91, quoting Restatement, *supra* at § 4.8(3), and *Roaring Fork Club, L.P.* v. *St. Jude's Co.*, 36 P.3d 1229, 1237 (Colo. 2001).

The party asserting the benefit of an easement has the burden of proving its existence, *Boudreau* v. *Coleman*, 29 Mass. App. Ct. 621, 629 (1990), its nature, and its extent. *Hamouda* v. *Harris*, 66 Mass. App. Ct. 22, 24 n.1 (2006), quoting *Levy* v. *Reardon*, 43 Mass. App. Ct. 431, 434 (1997), overruled on other grounds, *Queler* v. *Skowron*, 438 Mass. 304 (2002). Stating that our holding in *M.P.M. Builders, supra*, is inapplicable, Martin argues, as he did at trial, that because his property is registered land and he holds a certificate of title from the Land Court, his easement is absolute to the full extent indicated on the Land Court plan,[9] regardless of whether, as conceded, a narrower way

---

[9]Although the width of Way A as indicated by hatching on the J-Plan varies along its length, for the most part it is fifty feet wide.

permits him unrestricted access on foot and by vehicle. The Land
Court judge rejected this argument, discerning no principled
distinction between easements on registered land and easements
on recorded land, and determining that Martin's passage over the
unobstructed portion of Way A, as it has existed since the 1993
encroachments, has been consistent with the purpose of the ease-
ment as established in 1940.

The judge found that the entrance to Way A, as currently
configured, "is a more than adequate opening, and Martin does
not appear to disagree, conceding that there has never been any
adverse impact on his ability to use Way A in this area (or any
other, for that matter) for passage to and from his land." The
judge found also that the entrance foyer and loading dock at-
tached to 196 Boston Avenue, although extending for a longer
distance along the building than did the elevator shaft, protrude
no further into Way A than the elevator shaft, which is indicated
as an obstruction into Way A on the J-Plan. He determined that,
notwithstanding any of the other intrusions, including the depres-
sed entrance to 200 Boston Avenue, the parking spaces, the utility
poles, and the curbing and landscaping, Way A "functions without
difficulty" and "functions fully adequately for passage by all cur-
rent trucks and other vehicles that make use of the way." He
determined further that Way A "at all points along its length is
adequate to the current use and certainly, to any use which might
be claimed by the owner of lot 3A," and that no trucks making
deliveries and receiving goods "have had any difficulty navigat-
ing Way A as it is currently improved," even though "many of
the trucks today on the way are larger than those which would
have existed when the easements arose in 1940." The judge
concluded, "[A]s a factual matter, . . . there is a more than suf-
ficient width currently provided within the unobstructed limit of
Way A to accommodate current and reasonably foreseeable uses
of the easement area by those entitled to do so."

In reversing this aspect of the judgment, the Appeals Court
instead concluded that Martin is entitled to use of the full width
of the easement as shown on the plan, because it could identify
"no case that holds that only a convenient passage is intended
when a right of way is reserved over a way defined and located
by reference to a Land Court plan." *Martin* v. *Simmons Props.,*

*LLC, supra* at 408. While the question at issue in *M.P.M. Builders, supra* at 87-88, was the relocation of an easement rather than a modification of its dimensions, we stated in that case that "[r]egardless of what heretofore has been the common law, we conclude that § 4.8(3) of the Restatement is a sensible development in the law and we now adopt it as the law of the Commonwealth." *Id.* at 91. We see no reason to depart from this view. As we said in *M.P.M. Builders, supra* at 93, "[s]o long as the easement continues to serve its intended purpose, reasonably altering the location of the easement [as permitted by § 4.8(3)] does not destroy the value of it." That reasoning applies as well to circumstances such as those here, where there has been no relocation of the easement, but where the width of the unobstructed easement has been narrowed in some places, while still leaving travel by any existing or foreseeable vehicle unimpeded.

Moreover, although the property at issue in *M.P.M. Builders, supra,* was recorded land, nothing in the analysis distinguished between registered and recorded land, nor have our prior decisions that concern modifications to an easement. See, e.g., *Goldstein* v. *Beal,* 317 Mass. 750, 755 (1945) ("the same principles that govern the effect to be given a plan in the case of unregistered land apply where the land is registered"). We discern nothing in the land registration act, G. L. c. 185, to support a different understanding of the law of easements concerning registered land as opposed to recorded land. The act states explicitly that an "owner of registered land may convey, mortgage, lease, change or otherwise deal with it as fully as if it had not been registered." G. L. c. 185, § 57.

The purpose of the land registration act is to ensure that holders of parcels registered under the act enjoy certainty of title to their property. See G. L. c. 185, § 57; *Doyle* v. *Commonwealth,* 444 Mass. 686, 690 (2005), quoting *Wild* v. *Constantini,* 415 Mass. 663, 668 (1993); *McMullen* v. *Porch,* 286 Mass. 383, 389 (1934). The act provides that "[e]very plaintiff receiving a certificate of title in pursuance of a judgment of registration, and every subsequent purchaser of registered land taking a certificate of title for value and in good faith, shall hold the same free from all encumbrances except those noted on the certificate . . . ." G. L. c. 185, § 46. Such judgment "shall be conclusive upon and

against all persons [and] shall not be opened . . . by any proceeding at law or in equity for reversing judgments or decrees." G. L. c. 185, § 45. This certainty assists landholders and potential future purchasers, but otherwise creates no property rights distinct from those accorded any owner of real property.

The act provides also that, when land is registered, the judgment of registration "shall set forth" all easements to which the land is subject. G. L. c. 185, § 47. The act prohibits the establishment of easements by prescription, G. L. c. 185, § 53,[10] and prevents the extinguishment of an easement by prescription. Both of these provisions, however, concern the certainty of title to the property, assuring holders of registered land that their property will not be subject to any easement not set forth on their certificates of title, and that those easements appurtenant that are set forth on the certificate of title continue to exist. They do not purport to grant additional property rights to holders of registered land. See *Doyle* v. *Commonwealth*, 444 Mass. 686, 690 (2005) (noting that purpose of title registration is protection of transferees of land). Thus, we adhere to our well-established precedent and consider the easement here under existing jurisprudence as to recorded land.

We consider the public policy favoring socially productive use of land, set forth in comment b to § 4.9 of the Restatement, *supra*, to be a useful starting point in balancing the interests of the easement holder and the servient land owner. That portion of the Restatement provides:

> "In resolving conflicts among the parties to servitudes, the public policy favoring socially productive use of land generally leads to striking a balance that maximizes the aggregate utility of the servitude and the servient estate. Socially productive uses of land include maintaining stable neighborhoods, conserving agricultural lands and open space, and preservation of historic sites, as well as development for residential, commercial, recreational, and industrial uses. Aggregate utility is generally produced by interpreting an

---

[10]"No title to registered land, or easement or other right therein, in derogation of the title of the registered owner, shall be acquired by prescription or adverse possession. Nor shall a right of way by necessity be implied under a conveyance of registered land." G. L. c. 185, § 53.

easement to strike a balance that maximizes its utility in serving the purpose intended while minimizing the impact on the servient estate. In the case of conservation, open space, and historic preservation servitudes, however, seeking to minimize the impact on the servient estate is not appropriate. Interpreting the servitude to maximize the effectiveness of the servitude in accomplishing its purpose may produce the greatest aggregate utility."

Restatement, *supra* at § 4.9 comment b. See *Cater* v. *Bednarek,* 462 Mass. 523, 534 (2012), citing Restatement, *supra* at § 4.8 comment b, and *id.* at § 4.10 comment b. Consistent with the meaning of an easement, and in furtherance of the policy of maximizing the beneficial use available to the servient landholder,

"[t]he person who holds the land burdened by a servitude is entitled to make all uses of the land that are not prohibited by the servitude and that do not interfere unreasonably with the uses authorized by the easement or profit. An easement is a nonpossessory interest that carves out specific uses for the servitude beneficiary. All residual use rights remain in the possessory estate — the servient estate."

Restatement, *supra* at § 4.9 comment c.

In analyzing the extent of an easement, we look "to the intention of the parties regarding the creation of the easement or right of way, determined from the language of the instruments when read in the light of the circumstances attending their execution, the physical condition of the premises, and the knowledge which the parties had or which they are chargeable to determine the existence and attributes of a right of way." *Adams* v. *Planning Bd. of Westwood,* 64 Mass. App. Ct. 383, 389 (2005), quoting *Boudreau* v. *Coleman,* 29 Mass. App. Ct. 621, 629 (1980). Doubts as to the extent of a restriction in an easement "are resolved in favor of the freedom of land from servitude." *St. Botolph Club, Inc.* v. *Brookline Trust Co.,* 292 Mass. 430, 433 (1935).

Whether the use by the owner of the servient estate is reasonable depends on the facts and circumstances in a given case. *Guillet* v. *Livernois,* 297 Mass. 337, 341 (1937). See *Johnson* v. *Kinnicutt,* 2 Cush. 153, 157 (1848) (to determine whether alleged encumbrance "materially" interferes with right of way,

court evaluates reasonableness of encumbrance in context of purpose of easement). This is true even where the language of the easement as to its physical extent may appear on its face to be quite specific. For instance, in *Johnson* v. *Kinnicutt, supra,* the right of way set forth in the deed was "the right of passing and repassing over the space of twenty feet between the west wall of the store and the eastern line of the . . . granted premises." *Id.* at 156. We concluded that the easement holder was entitled only to a "convenient way" over the area, for a "useful and proper purpose," not to "unobstructed use of the whole space." *Id.* at 157. See *Barrett* v. *Duchaine,* 254 Mass. 37, 39, 41 (1925) (deed granting "right of way over a strip of land lying between two houses" did not grant way "over the whole of that land," but "reference[] only . . . the area in which the way was to be located"); *Bedford* v. *Cerasuolo,* 62 Mass. App. Ct. 73, 81 (2004), quoting *George* v. *Cox,* 114 Mass. 382, 388 (1874) (where parties to deed reserved right of way at private crossing point over railroad bed, but did not specify width of easement, easement was for "a way of convenient width for all the ordinary uses of free passage").

Of course, parties may, in the language they employ to create an easement, prohibit any alteration in its dimensions, grade, or location, or provide explicitly that the easement is to remain in a fixed location or retain a fixed dimension. Thus, for instance, in *Brookline* v. *Whidden,* 229 Mass. 485, 489 (1918), land was conveyed to the town "with the benefit of and subject to such rights and easements as may now be in force respecting the laying out and use of a street fifty feet wide called Essex street along the easterly side of the granted premises." The grantor gave the "fee of the streets and squares I have laid out and opened on my estate . . . in trust that the same shall be kept open forever for ornament and use as streets and squares only and for the benefit of all residents . . . contiguous to said streets and squares." Because the language contained the explicit requirements that the land "be kept open forever" and that its use be limited to "streets and squares only," encroachments into the fifty-foot width of the street had to be removed, notwithstanding that the street was still fully passable. *Id.* at 491-492, 494.

Where the language of an easement requires that a way of a

defined width be kept open, or that the full extent of the width described be usable, we have prohibited any encroachment into the way. See *New York Cen. R.R.* v. *Ayer*, 239 Mass. 70, 74, 77 (1921) (where instrument provided that "a strip of land twenty [20] feet wide on and along the southerly and westerly sides of the granted premises *shall be forever kept open* for a passageway and for light and air and drainage" [emphasis supplied], court concluded that "the words of the grant and reservation import an intent of the parties that the entire passageway and not a convenient part of it shall be subject to an easement"); *Gray* v. *Kelley*, 194 Mass. 533, 534-535 (1907) (in declaration laying out way, parties said they "*set apart and appropriate forever the land occupied by said way, twenty-four feet wide*, as a private way for all the present and future abutters thereon" and subsequently granted each abutter "right to pass and repass at pleasure over *any part* of said private way of twenty-four feet wide adjoining the premises" [emphasis supplied] conveyed easement over entire width). See also, e.g., *Beaudoin* v. *Sinodinos*, 313 Mass. 511, 517-518 (1943) (deed describing entire metes and bounds of private way); *Carter* v. *Sullivan*, 281 Mass. 217, 219, 223 (1932) (where "passageway [was] five feet wide running south from Myrtle Street" and deed provided for "free use and privilege of said passageway," easement holder was granted right to use passageway for described purposes "throughout its entire width"); *Onorati* v. *O'Donnell*, 3 Mass. App. Ct. 739, 739 (1975) (deeds which "established and referred to the right of way, limited its dimensions, and located it by reference to a Land Court plan" were "clear, explicit, and free from ambiguity" and conveyed "full twenty-foot width specified and referred to in the deeds").

Martin's certificate of title, by contrast, does not contain any reference to the full width of the easement as drawn on the J-Plan, or any language restricting a change in its dimensions, prohibiting other uses, or requiring that the easement be kept open throughout its full extent. Rather, it references the deed reserving to lot 4A a "right of way in common with lot 3A . . . over rights of way 'A,' 'B,' 'C' and 'E' as shown on" the J-Plan. Indeed, as the judge noted, Martin's certificate of title does not set forth an "exact location" of any of the easements at issue,

or describe in words the "location and limits" of any one of them. This is akin to the language in *Johnson* v. *Kinnicutt, supra*, setting forth a right of way between the west wall of a store and the property line for "passing and repassing over the space," or to the "right of way over a strip of land lying between two houses" in *Barrett* v. *Duchaine, supra*, where the language made no explicit limitations and the circumstances indicated an intent to provide only a convenient passage within some portion of the granted way. Moreover, the clear intent of the parties, as the judge discussed in describing the series of shared ways established when the Textile Realty Company's parcel was divided into separate ownership, was that the easement over Way A be used for access to lot 3A, requiring only a "convenient passage" over the easement area. See *Johnson* v. *Kinnicutt, supra*.

As they exist today, and given Martin's current use of his property, the encroachments into Way A do not lessen its utility for passage by vehicles much larger than any in existence when the way was created, do not increase the burden on Martin in his use of the way, and do not frustrate the purpose of travel to Martin's lot. See Restatement, *supra* at § 4.8(3). Thus, we affirm the judgment of the Land Court that the encroachments by Simmons, and by its predecessors in interest at some point no later than 1987, do not interfere with Martin's easement rights to passage over Way A, and that Simmons is not liable for removal of any of the obstructions. As the judge noted, however, this matter may be revisited should Martin redevelop lot 3A in such a manner that these obstructions impede upon his use of the easement for its intended purpose.

d. *"Unhatched area."*[11] Martin contends that, notwithstanding the absence of any hatching on the "J-Plan" to the south

[11]Martin, acting pro se, pursued this claim in the Land Court and the Appeals Court. After the Appeals Court affirmed most of the Land Court judge's decision, but reversed as to Martin's rights to Way A, Simmons sought further appellate review; that petition was allowed without limitation. Although Martin did not address this claim explicitly in his brief to this court, he discussed issues of parking and turning trucks around on land that appears to encompass Way E and the "unhatched area." Similarly, although Martin stated at oral argument that he was not pursuing any claims concerning the "unhatched area," both before and after that statement, he raised the same arguments as he did in the Land Court and the Appeals Court concerning parking of vehicles on Way E,

of Way E, he has an easement for travel over that area. The area was indicated by hatch marks in an earlier version of the plan, the 1939 I-Plan.[12] While conceding that an easement by prescription cannot be created on land subject to a Land Court certificate of title, Martin maintains that the prior conduct of the parties establishes that the unhatched area was used continuously to permit vehicles to turn around prior to the creation of the J-Plan. He argues also that the right of way is so narrow where it makes a ninety-degree turn to the north at the corner of the now demolished building on lot 4A, that the original grantee could not have intended to accept an easement with such limited value, and that the deed and the certificate should be amended to reflect what Martin asserts is a mistake in drafting.

The judge found, as Martin conceded at trial, that the Textile Realty Company, the then owners of lots 3A and 4A, drafted the J-Plan deliberately, intentionally omitting the hatched area that had appeared on the I-Plan, that its omission was not as a result of carelessness in drafting; and that Martin had presented no evidence of the intent of his predecessors in interest to obtain an easement over the unhatched area. In considering the evidence of intent or mistake, the judge observed that, in addition to Way A, lots 3A and 4A are benefited by an interlocking system of easements; Martin's parcel is and was accessible over Ways A, C, D, and E; and access to lot 3A over Way A was not so

---

and the consequent inability of trucks to make the ninety-degree turn on Way A. He emphasized that the large trucks (sixty-five feet) in use today are unable to turn around other than to travel over the land in the "unhatched area," which he asserted had been the practice before the building on lot 3A burned down. He stated further that, without use of what the Appeals Court had declared to be Simmons's unburdened property, Way A was useable for travel on foot or by automobile, but not for trucks unless they backed in and out, and thus, as he had argued in the Land Court, that his easement over Way A was "useless" absent the unhatched area. Simmons then presented argument on the question of the unhatched area, parking, and the former platform on portions of Way E. Given the arguments by both parties, their centrality to the issues concerning Way A, the explicit indications of uncertainty in Martin's brief concerning what he could argue before this court since it was Simmons's petition that was allowed, and Martin's status as a pro se litigant, we address all of the claims raised in the Appeals Court.

[12]The 1939 I-Plan was drafted by the Textile Realty Company before it drafted the 1940 "J-Plan Linen" that formed the basis for the J-Plan ultimately approved by the Land Court.

restricted that it must necessarily indicate a mistake on the part of the original grantee.

The doctrine of mistake requires a mutual mistake. *McGovern v. McGovern*, 77 Mass. App. Ct. 688, 699 (2010). Even had Martin's predecessors in interest intended to accept a larger easement than shown on the J-Plan, there was, at most, a mistake by one party. We discern no error in the judge's conclusion that Martin has not established any easement rights over the unhatched area.

e. *Simmons's rights to use Way E.*[13] Martin argues that Simmons's right to travel over Way E has been extinguished because the raised platform that formerly covered much of Way E no longer exists, and that Simmons has abandoned the easement, or, in the alternative, that the easement over Way E was not an easement appurtenant but, rather, intended only to accrue to the initial beneficiary. As does Martin, Simmons holds title to its parcels through a Land Court certificate of registration. Thus, like Martin's right to use Way A, Simmons's right to use Way E cannot be extinguished through nonuse or prescription. See G. L. c. 185, § 53; *Lasell College* v. *Leonard*, 32 Mass. App. Ct. 383, 390 (1992). An easement over registered land may, however, be extinguished by abandonment. *Desotell* v. *Szczygiel*, 338 Mass. 153, 158-159 (1958). Abandonment of an easement requires a showing of intent and acts inconsistent with its continued existence. *Cater* v. *Bednarek*, 462 Mass. 523, 528-529 & n.15 (2012). "[N]onuse of itself, no matter how long continued, will not work an abandonment." *Id.* at 529 n.15, quoting *Desotell* v. *Szczygiel, supra* at 159.

We discern no error in the judge's conclusion that Simmons's easement for access over Way E exists, in dimension and location, as indicated on the J-Plan. Although a raised wooden platform previously connected Way E and Way A, the purpose of travel over Way E has not been frustrated. Not only is travel on the ground at the current location of Way E feasible, the judge noted that, since the buildings formerly connected by the raised platform no longer exist, the easement holder may well prefer to travel at ground level. Moreover, the language of the easement itself clearly contemplates a way separate and distinct

---

[13]See note 11, *supra.*

from the raised platform; Simmons's certificate of title to lot 4A states that the creation of Way E "shall impose no obligation upon the owner of lot 3A to maintain the platform over which right of way 'E' runs but shall give the purchaser the right to go upon said lot 3A to maintain or repair said platform."

f. *Fill.* Martin claims here, as he did below, that Simmons placed fill on Way A, Way E, and lot 3A, elevating its grade from what had been "essentially flat." He maintains that the fill reduced the amount of land on lot 3A available for construction and parking, because a ramp would be needed to connect lot 3A to Way A, and that the location of any future building on lot 3A would necessarily be much higher than what had been the "dock height" of the first floor of the former structure, such that loading and unloading of materials on the first floor of any new building would not be feasible.

The owner of a servient estate over which an easement for passage runs may not make "any change in its grade or surface, which makes the way less convenient and useful to any appreciable extent to any one who has an equal right in the way." *Killion* v. *Kelley*, 120 Mass. 47, 52 (1876). See *Crowley* v. *J.C. Ryan Constr., Inc.*, 356 Mass. 31, 35 (1969); *New York Cent. R.R.* v. *Ayer*, 242 Mass. 69, 76 (1922).

In addition to his own testimony concerning the fill, Martin introduced photographs of the fill, taken in 1993.[14] The judge found that, while fill had apparently been placed both on lot 3A and within Way A on Simmons's property, no later than 1993, Martin did not establish by a preponderance of the evidence either the source of the fill or whether it had been placed there by Simmons. He introduced no land surveys, expert testimony, or other evidence to establish the height and configuration of Way A or lot 3A prior to the placement of the fill. The judge concluded further that the fill allegedly placed on Way E was placed entirely on Simmons's property, and not within Way E. The judge found also that the elevation of Way A as a result of any fill did not impede travel along the length of Way A or make it more inconvenient.

The judge's findings as to the ability to travel on Way A given

---

[14]Martin's brother, who took the photographs, did not testify, and Martin was not present when the photographs were taken.

its existing grade is amply supported by the record. The evidence established that automobiles and trucks travel daily from Boston Avenue along the length of Way A to the existing businesses at both 196 and 200 Boston Avenue. As to whether placement of the fill elevated Way A to such an extent that it is substantially less useful to Martin, either because delivery of goods to any potential building on lot 3A would be more difficult or because there would be less land available for building, the record amply supports the judge's finding that Martin failed to meet his burden of proof. Because Martin was unable to establish that Simmons placed the fill, the extent of any change in elevation as a result of the fill, or the impact of any such change, there was no error in the judge's conclusion that Simmons has no obligation to remove the fill.

g. *Storm drains and sewer, sprinkler, and water pipes.*[15] Martin presses a number of claims with respect to interference by Simmons in his rights to use storm drains, sewer pipes, sprinkler pipes, and water pipes located within easements set forth in his certificate of title and shown on the J-Plan. The judge determined that Martin's claims as to the sewer, sprinkler, and water pipes properly should be considered as tort claims. Finding that Martin was aware of the purported disconnection or destruction of the sewer, sprinkler, and water pipes by 1993, when Simmons demolished the building through which the pipes had run, the judge held that these claims were time barred.

As the Appeals Court determined, however, the claims relate to encumbrances on real property, and should not have been considered under a tort statute of limitations.[16] Nonetheless, the trial judge also made specific findings as to the merits of the claims; relying on those findings, we affirm the judgment that Simmons has no obligation to restore the storm drains to their 1940 locations, nor to restore any of the other connections which may have been severed. Although Martin retains the rights to use

[15]See note 11, *supra.*

[16]Since lot 3A is registered land, Martin's easement rights cannot be extinguished through nonuse, G. L. c. 185, § 53, and his claims are not time barred. See *Cater* v. *Bednarek,* 462 Mass. 523, 528-529 & n.15, 533 (2012) (no abandonment and no extinguishment by estoppel where owner of easement for travel made no attempt to use easement for ninety-eight years and houses were constructed on servient estates in interim).

all of the easements, the judge determined correctly that Martin also bears the cost of any necessary restoration or maintenance. See *Prescott* v. *White*, 21 Pick. 341, 342 (1838).

As to the storm drains, the language of the easement states that lot 3A enjoys a right, together with other parcels, to "discharge water into the [two drain lines]" that lead in part across lot 4A toward the Mystic River Reservation, "portions of [which] are shown on said Plans." Simmons concedes that the eighteen and twenty-four inch storm drains, indicated by circles on the J-Plan, were covered with asphalt in 1993. At that time, Simmons installed three other storm drains elsewhere on its parcels. Clarke, the chief executive officer of Cummings Properties, testified at trial, and the judge credited, that there have been no complaints of inadequate drainage from any of the tenants at 196 or 200 Boston Avenue, and Martin introduced no evidence that lot 3A had suffered from drainage problems.

The judge determined that no evidence was introduced that the relocated drains on lot 4A and lots 10 and 12 are inadequate to handle runoff on those parcels as well as on lot 3A, and, further, that no evidence suggested the existing drains would be inadequate to handle runoff from any foreseeable building that might be constructed on lot 3A; thus, Martin had not met his burden of proof to establish interference with his easement rights. There was no error in the judge's conclusion that Martin had not established any interference with his right to discharge water into the storm drains, and therefore that the drains need not be restored to their 1940 configuration.

According to their transfer certificates of title, the owners of lots 3A and 4A have the right "to maintain and use the four-inch (4") and six-inch (6") sewer pipes leading southwesterly across lots 4A and 7 on [the J-Plan] to Boston Avenue, a portion of which sewers is shown on said Plan." Martin's certificate of title provides also that he may use a six-inch sprinkler pipe and a one and one-half inch water pipe that were in existence at the time the easement was created.[17] It is undisputed that the six-inch sprinkler pipe froze and burst, and was not repaired,

---

[17]The owner of lot 3A also enjoys the right "to lay and maintain water, sprinkler, gas and sewer lines and electric lines or conduits in any of the rights of way shown on" the J-Plan. Martin concedes that he has made no attempt to

prior to the fire which destroyed the wooden building on lot 3A, and before Simmons's acquisition of lot 4A.

Martin maintains that the connection from the building that stood at the northeast corner of the current building at 200 Boston Avenue to the location of his burned building on lot 3A must have been blocked or destroyed when Simmons demolished its building. As the judge found, however, Martin introduced no evidence, other than his "commonsense" belief, that the four-inch sewer pipe[18] or the one and one-half inch water pipe leading from the building on lot 4A had been disconnected. To the contrary, Knittle, the leasing property manager for Cummings Properties, testified that removal of sewer and water pipes had not been part of the application for a demolition permit that he prepared for the demolished building. The judge noted also that the six-inch sprinkler pipe is not unavailable as a result of any action by Simmons.

Simmons states that it does not dispute Martin's right to access water or other utilities over pipes installed at any point within the easement area shown on the J-Plan, so long as it is done at Martin's expense. See *Shapiro* v. *Burton*, 23 Mass. App. Ct. 327, 333 (1987) ("duty of maintaining an easement in such condition and repair as may be necessary to its exercise normally rests upon the holder of the easement"). Moreover, Martin's certificate of title states explicitly that the pipes are to be maintained, and the water to be metered, at his expense.[19] Although the claims should not have been treated as time barred under the tort statute of limitations, there was no error in the judge's subsequent conclusion that Martin may not require Simmons to bear any costs of restoring his ability to use the water and sprinkler pipes.

*Judgment affirmed.*

install any new lines or to maintain or use any of the lines that formerly connected to his now-demolished building.

[18]As stated, see note 6, *supra*, the judge allowed Martin's motion to dismiss his claim concerning the use of the six-inch sewer pipe.

[19]As set forth in his certificate of title, Martin enjoys an easement "to draw water through the existing water pipes serving the buildings upon said lot 3A where they cross the premises above described [lot 4A], provided that the owner of said lot 3A shall pay the cost of said water and the cost of properly metering the same."