NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-1611                                        Appeals Court

ACUSHNET COMPANY <u>vs</u>.  BEAM, INC.[1]


No. 16-P-1611.

Suffolk.     September 14, 2017. - February 2, 2018.

Present:  Wolohojian, Agnes, & Wendlandt, JJ.


<u>Corporation</u>, Sale of assets, Subsidiary.  <u>Contract</u>, Construction
     of contract.  <u>Sale</u>, Contract of sale, Of corporate
     property.  <u>Taxation</u>, Accounts receivable.  <u>Practice, Civil</u>,
     Summary judgment, Findings by judge.



     <u>Civil action</u> commenced in the Superior Court Department on
March 27, 2012.

     The case was heard by <u>Kenneth W. Salinger</u>, J.

     <u>Eric R. Breslin</u>, of New Jersey (<u>Sean S. Zabeneh</u>, of
Pennsylvania, <u>& Bronwyn L. Roberts</u> also present) for the
plaintiff.
     <u>Michael J. Tuteur</u> (<u>Michael Thompson</u> also present) for the
defendant.


     WOLOHOJIAN, J.  At issue is the interpretation, under New

York law, of a provision in the stock purchase agreement

pursuant to which Beam, Inc. (Beam), sold its subsidiary,

---

     [1] Formerly known as Fortune Brands, Inc.

Acushnet Company (Acushnet).[2]  More specifically, the parties disagree as to which of them is entitled to $16.62 million of value added tax (VAT) receivables carried on Acushnet's balance sheet at the time of the closing.  Beam took the amount as a postclosing setoff for its own benefit; in response, Acushnet brought this suit.  On cross motions for summary judgment, a judge of the Superior Court determined that the contract provision was ambiguous.  A jury-waived trial followed before a second judge, who found that the "apparent purpose of the parties" was to allow for the setoff.  On appeal, Acushnet argues (1) that the motion judge erred, as a matter of law, when she concluded that the contract provision was ambiguous; and (2) that the trial judge's interpretation of the contract was clearly erroneous.  We affirm.

Background.  The following facts are either undisputed or taken from the trial judge's findings of fact and supported by the record.

In late 2010, Beam decided to sell Acushnet (a wholly-owned subsidiary engaged in the manufacture and distribution of golf products) by way of auction.  The eventual winning bidder was a

_____

[2] At the time, Acushnet was owned by Fortune Brands, Inc. (Fortune), which, following the sale of Acushnet, changed its name to Beam, Inc.  The company was then acquired by another entity and changed its name to Beam Suntory, Inc.  To avoid confusion, we simply refer to the defendant seller as "Beam" throughout.

group led by FILA Korea, Ltd. (buyer group), and, after a period of negotiations, the parties formalized the deal in a stock purchase agreement (SPA), dated May 19, 2011.[3]  A little over two months later, on July 29, 2011, the transaction closed, with the buyer group purchasing all of the stock in Acushnet for $1.225 billion, subject to certain postclosing adjustments.  Acushnet operated thereafter under its new ownership.

To ensure the sale proceeded promptly and smoothly, Beam decided prior to soliciting bids to remove all issues regarding taxes by creating a bright-line allocation of Acushnet's preclosing tax liabilities to itself, as seller, and of postclosing tax liabilities to Acushnet and its new owners. While no one from the Beam side explicitly conveyed that intent to anyone representing the buyer group,[4] it was manifestly clear from the structure of the transaction as reflected in the SPA, as well as every draft of the SPA exchanged between the parties.[5]

---

[3] The actual parties to the SPA were Fortune, see notes 1 and 2, supra, and Alexandria Operations Corp., a holding company created by the buyer group.

[4] Each side was represented in the transaction by a team of its own employees and a team of outside accountants, lawyers, and investment bankers.

[5] Sections 8.01(a) and (c) of the SPA, which were largely unaltered during negotiations, provide, in pertinent part:

"(a) Seller shall be liable for and pay an amount equal to, and shall indemnify and hold harmless the Buyer Group from and against (i) all Taxes imposed on any Acushnet Company,

That said, the parties anticipated at least two types of tax situations where further arrangement was required. First, they foresaw that some of Acushnet's postclosing tax returns would include preclosing tax liabilities. To deal with this situation, the parties agreed in the SPA that Beam would reimburse Acushnet for any preclosing tax liabilities included in Acushnet's postclosing tax returns.[6]

Second, the parties also anticipated the possibility that amounts related to preclosing tax liabilities might come into

---

or for which an Acushnet Company may otherwise be liable, for, or with respect to, any taxable year or period that ends on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date . . . .

". . .

"(c) Buyer shall be liable for and pay, and shall indemnify the Seller Group from and against, (i) all Taxes imposed on an Acushnet Company, or for which any Acushnet Company may otherwise be liable, for, or with respect to, any taxable year or period that begins after the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period beginning after the Closing Date . . . ."

[6] Section 8.02(a) of the SPA provides, in pertinent part:

"Buyer shall timely file or cause to be timely filed when due (taking into account all extensions properly obtained) all other Tax Returns that are required to be filed by or with respect to any Acushnet Company and Buyer shall remit or cause to be remitted any Taxes due in respect of such Tax Returns. . . . Seller or Buyer shall pay the other party for the Taxes for which Seller or Buyer, respectively, is liable pursuant to Section 8.01 (after taking into account any limitations herein), but which are payable by the other party (after taking into account estimated taxes paid by the first party) . . . ."

Acushnet's possession after the closing and need to be paid over to Beam. The parties addressed this in section 8.01(b) of the SPA, which provides, in pertinent part:

> "Any tax refunds that are received by or with respect to any Acushnet Company, and <u>any amounts credited against or with respect to Taxes to which any Acushnet Company becomes entitled</u>, that relate to any taxable year or portion thereof that ends on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date, <u>shall be for the account of the Seller, and Buyer shall pay</u> (or cause the relevant Acushnet Company to pay) <u>over to the Seller</u> any such refund or <u>the amount of any such credit actually received in cash</u> within thirty (30) days after the actual receipt thereof in the case of a refund, or <u>within thirty (30) days after the filing of any Tax return in which the credit is used</u>, except to the extent Seller Group has an indemnification or payment obligation under this Agreement for such Taxes that has not been satisfied . . ." (emphasis added).

The highlighted language, the interpretation of which is at issue in this dispute, came to be included in the final version of section 8.01(b) through the combined drafting efforts of the parties.[7]

As originally proposed in the first draft of the SPA circulated by Beam on April 7, 2011, section 8.01(b) provided:

> "Any tax refunds that are received by or with respect to any [Acushnet] Company, and <u>any amounts credited against or with respect to Taxes</u> to which any [Acushnet] Company becomes entitled, that relate to any taxable year or portion thereof that ends on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing

---

[7] The parties agreed in the SPA that they had both participated in its drafting and negotiation and that it would not be construed for or against either party.

Date, shall be for the account of the Seller, and Buyer shall pay (or cause the relevant [Acushnet] Company to pay) over to the Seller any such refund or the amount of any such credit within ten (10) days after receipt thereof or entitlement thereto, except to the extent Seller Group has an indemnification or payment obligation under this Agreement for such Taxes that has not been satisfied" (emphasis added).

On May 2, 2011, the buyer group responded and provided Beam with proposed changes throughout the SPA, including the following proposed additions and deletions to section 8.01(b):

"Any Tax refunds that are received by or with respect to any [Acushnet] Company, and any amounts credited against or with respect to Taxes to which any [Acushnet] Company becomes entitled, that relate **solely** to any taxable year or portion thereof that ends on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date, shall be for the account of the Seller, and Buyer shall pay (or cause the relevant [Acushnet] Company to pay) over to the Seller any such refund or the amount of any such credit **actually received in cash** within ~~ten~~**thirty** (~~10~~**30**) days after **the actual** receipt thereof ~~or entitlement thereto~~**in the case of a refund, or within thirty (30) days after the filing of any Tax return in which the credit is used**, except to the extent Seller Group has an indemnification or payment obligation under this Agreement for such Taxes that has not been satisfied" (strikeout and emphasis original).

Beam accepted all of these proposed changes except for the addition of the word "solely." When the buyer group did not insist on the inclusion of that word, therefore, section 8.01(b)

was complete. The parties never communicated about section 8.01(b) other than through the exchange of drafts.[8]

Nor did the parties discuss value added taxes (VAT) during their negotiations. Nonetheless, it was undisputed that value added taxes were included in the term "Taxes," as defined in the SPA.[9] And the buyer group was aware from the outset that Acushnet conducted business in countries that, unlike the United States, utilize a VAT system.

A VAT is a consumption tax, akin to a sales tax, that is imposed, in supposed recognition of the "value added," at each stage of the production or distribution chain. Each initial and intermediary vendor or retailer in the chain, such as Acushnet, pays VAT on its own purchases of raw materials and other necessary products from its suppliers (input VAT), and then bills and collects VAT from its own customers (output VAT), with

---

[8] The buyer group's outside tax attorney recalled one conversation with Beam's outside tax attorney regarding section 8.01(b), but could not recall any specifics.

[9] As defined in the SPA, "Taxes" included:

"[A]ll federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties."

the final customer in the chain, often a consumer, paying the entire amount of the VAT. At the end of each VAT tax period, which can be monthly, quarterly, or annually depending on the jurisdiction, each vendor or retailer along the chain, other than the final customer, reports and pays to the applicable taxing authority all of the output VAT that it has billed to its customers during that period, after taking a credit for all of the input VAT that it has paid during the same tax period. Output VAT is reported and paid to the taxing authority even if the tax has not yet been collected from customers. In theory, each vendor or retailer in the chain, other than the final customer, should be placed in a "net zero" position with respect to VAT by (1) taking a credit on a VAT tax return for the input VAT it has paid and (2) collecting from its customers the output VAT that it has paid to tax authorities.[10]

Typically, a vendor or retailer does not report the amount of VAT it is owed as a separate figure or asset on its balance sheet, but instead includes it within its over-all "accounts receivable." Starting as far back as 2003, however, Acushnet had recorded VAT receivables in a separate line item on its

---

[10] If some portion of the VAT billed to customers proves uncollectible, a vendor or retailer can still be "made whole" by taking a credit for the loss on a future VAT tax return.

balance sheet, labeled "VAT receivable-trade."[11]  Since Acushnet was not always in a position to calculate the amount of outstanding VAT receivables with precision in every jurisdiction where it collected VAT, the figure reported in that line was, to a certain extent, an estimate.  At the time of closing, the estimated amount reported in the "VAT receivable-trade" line item was $16.62 million.

While the words "VAT receivables" do not appear in the SPA, those receivables were referenced in the accompanying disclosure schedules.  By agreement of the parties, a "working capital adjustment" was to be made for any difference between Acushnet's "base working capital"[12] and the actual amount of its working capital at the time of closing, with a corresponding postclosing payment made by, as appropriate, the seller or buyer.[13]  To that end, there were two accounting notes in the "working capital calculation" section of the disclosure schedules indicating that VAT receivables had been reclassified as "other current assets" and were not included in accounts receivable; this meant that

---

[11] This was because, when Beam would examine the "working capital efficiency" of its various subsidiaries, Acushnet, as the only one that collected VAT, always appeared to have inordinately large accounts receivable.

[12] The base working capital was established in the SPA.

[13] The actual working capital at closing exceeded the base working capital and, as a result, the buyer group paid Beam an additional $62 million.

VAT receivables would not be included in the working capital adjustment. Beam included the accounting notes to clarify how Acushnet historically classified VAT receivables. The parties never specifically discussed VAT receivables or the accounting notes prior to the closing.

On October 20, 2011, almost three months after the closing, Acushnet, now under its new ownership, sent Beam a demand pursuant to the SPA, for reimbursement of $19.29 million in taxes that Acushnet had paid, postclosing, to various tax authorities for preclosing tax liabilities. Of the $19.29 million, approximately $3 million was for VAT.[14] On November 1, 2011, Beam reimbursed Acushnet for only $2.67 million, after taking a setoff of $16.62 million -- the amount that was reflected in the "VAT receivable-trade" line item at the time of closing.[15] According to Beam, it was entitled to the setoff under section 8.01(b) of the SPA because VAT receivables were "amounts credited against or with respect to Taxes" for preclosing tax periods. Acushnet disagreed, and this suit,

---

[14] Acushnet, on Beam's behalf, had paid the $3 million in VAT to tax authorities in various countries after applying credits for approximately $5 million in input VAT that Acushnet paid to its suppliers prior to the closing against approximately $8 million in output VAT that Acushnet billed to customers, again, prior to the closing.

[15] Beam does not dispute that the $19.29 million was otherwise due and owing.

seeking a declaratory judgment and asserting claims of breach of contract and violation of G. L. c. 93A, followed.[16]

Discussion. 1. Ambiguity of the contract provision. We turn first to the motion judge's denial of the cross motions for summary judgment on the ground that section 8.01(b) of the SPA is ambiguous.[17] "Whether an agreement is ambiguous is a question of law for the courts," Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 13 N.Y.3d 398, 404 (2009) (quotation omitted), and is subject to our de novo review. See Balles v. Babcock Power Inc., 476 Mass. 565, 571 (2017).[18] Ambiguity is assessed "by looking within the four corners of the document, not to outside sources. . . . [C]ourts should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over

---

[16] Acushnet does not appeal from the trial judge's allowance of Beam's motion for a directed verdict on Acushnet's claim for alleged violations of G. L. c. 93A.

[17] Acushnet wrongly ascribes the ambiguity ruling to the trial judge. The sole focus of the trial was, as the trial judge himself noted, "to decide the meaning of a single phrase in a contract that [the motion judge] has ruled is ambiguous."

[18] In conducting that review, we apply New York law. Section 11.08(a) of the SPA provides, in part: "This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York."

substance and a sensible meaning of words should be sought."
Kass v. Kass, 91 N.Y.2d 554, 566 (1998) (quotation omitted). "A
contract is unambiguous if the language it uses has a definite
and precise meaning, unattended by danger of misconception in
the purport of the agreement itself, and concerning which there
is no reasonable basis for a difference of opinion." Greenfield
v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002) (quotation
omitted). Ambiguity "arises when the contract . . . fails to
disclose its purpose and the parties' intent . . . , or where
its terms are subject to more than one reasonable
interpretation." Universal Am. Corp. v. National Union Fire
Ins. Co. of Pittsburgh, Pa., 25 N.Y.3d 675, 680 (2015)
(quotations omitted).

Acushnet argues that the phrase "amounts credited against
or with respect to Taxes" in section 8.01(b) clearly means --
and can only mean -- credits applied on a tax return filed with
a tax authority.[19] This interpretation, Acushnet suggests, is
mandated by the language later in section 8.01(b) that required
it to pay Beam "the amount of any such credit . . . within
thirty (30) days after the filing of any Tax return in which the
credit is used." In other words, Acushnet maintains that the

---

[19] Beam, meanwhile, has abandoned the position it took at
the summary judgment stage and asserts that the motion judge
"appropriately concluded" that section 8.01(b) is ambiguous. It
has also withdrawn its cross appeal.

language later in section 8.01(b) narrows the substantive scope of the language appearing earlier in the section. And, according to Acushnet, VAT receivables are not credits taken, used, or applied on a tax return filed with a tax authority. Instead, the VAT receivables reported on Acushnet's balance sheet only represent a "snapshot in time" of the estimated amount of VAT still due to Acushnet from customers, without regard to the tax period in which the underlying output VAT had been billed to customers and reported and paid to the applicable tax authority.

We start by reviewing the plain language of section 8.01(b). In that regard, Acushnet rightly insists that we must interpret the disputed provision and contract as a whole. At the same time, however, it effectively asks us, through its proffered interpretation, to read the phrase "with respect to" out of section 8.01(b). This we cannot do. See Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475 (2004) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" [quotation omitted]).

By its ordinary meaning, the phrase "with respect to," like other similar phrases (e.g., "relating to," "in connection with," "associated with," "with reference to"), suggests an

"expansive sweep" and "broad scope." California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 324 (1997). See Coregis Ins. Co. v. American Health Foundation, Inc., 241 F.3d 123, 128-129 (2d Cir. 2001); Kamagate v. Ashcroft, 385 F.3d 144, 154 (2d Cir. 2004). At the same time, we must avoid applying a "hyper-literal approach" to our interpretation of what can seem to be an open-ended phrase. See Greater N.Y. Metropolitan Food Council, Inc. v. Giuliani, 195 F.3d 100, 106 (2d Cir. 1999) (Giuliani). With all of this in mind, we start from the premise that the phrase "with respect to" as utilized in section 8.01(b) must be taken to expand the scope of the amounts that are "for the account" of Beam, as seller, beyond those "credited against . . . Taxes." So too, as the parties agreed, the word "Taxes" was defined in the SPA to include VAT. VAT receivables, in turn, are amounts owed by customers for VAT. In short, we cannot conclude that the language in section 8.01(b) has such a definite and precise meaning as to exclude VAT receivables, even though we understand that the VAT receivables reported on Acushnet's balance sheet were not necessarily synonymous with the output VAT reported on a particular tax return.

Certainly, if the intent had been to limit Beam's rights under section 8.01(b) to tax credits taken or used on a tax return, that could have been stated differently. Clearly, the

parties could have deleted the words "or with respect to." They also could have replaced the words "amounts credited against or with respect to Taxes" with the phrase "tax credits." The phrase "Tax refunds" appears in section 8.01(b),[20] but not "Tax credits." This is notable given that the parties used the phrase "Tax refund or credit" in other parts of section 8.01.[21] We have to assume, therefore, that they were aware of the phrase "tax credits" and would have used it had they intended to impose the same meaning in section 8.01(b). See International Fid. Ins. Co. v. Rockland, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000) ("Sophisticated lawyers . . . must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning"). Instead, the parties used a phrase that lends itself to ambiguity. See Giuliani, 195 F.3d at 105 ("[A]mbiguity resides . . . in the open-ended language . . . 'with respect to'").

---

[20] There is no dispute that the VAT receivables did not qualify as "tax refunds" under section 8.01(b).

[21] Sections 8.01(e) and (f) address tax audits or amendments of tax returns that result in an increase or decrease in, among other things, the amount of a "Tax refund or credit to which [Beam] is entitled under Section 8.01(b)." Acushnet argues that this bolsters its argument that Beam is only entitled to "Tax refunds or credits" under section 8.01(b). Given the context in which that phrase is used in sections 8.01(e) and (f), however, it does not appear reasonable to draw such an inference.

The language later in section 8.01(b), relied upon by Acushnet, is also not a model of clarity. When read in full, it requires Acushnet to pay Beam "the amount of any such credit <u>actually received in cash</u> . . . within thirty (30) days after the filing of any Tax return in which the credit is used" (emphasis added). The attorney who inserted that language on behalf of Acushnet testified that it was not "artfully drafted," given that a tax credit is typically not received in cash but, rather, taken as an offset.[22] Inartfully drafted or not, however, the language cannot be ignored.

Finally, Acushnet argues that its interpretation of section 8.01(b) is the only one consistent with the transaction as a whole. Specifically, Acushnet notes that, in return for the payment of $1.225 billion, the buyer group purchased all of the stock and, thus, all of the assets of Acushnet. As per the accounting notes that Beam inserted in the disclosure schedules, VAT receivables were identified as one of Acushnet's "other current assets"; and nowhere in the contracting documents were VAT receivables excluded from the sale. Hence, according to Acushnet, the VAT receivables were one of the assets purchased by the buyer group.

---

[22] Acushnet's attorney testified that he intended the words "actually received in cash" to refer to tax refunds.

The transaction, however, was also structured to allocate Acushnet's tax liabilities and benefits to Beam and the buyer group on a pre- and postclosing basis, respectively. And, once again, while the $16.62 million in VAT receivables on Acushnet's balance sheet were not "Taxes" per se as defined in the SPA, they were related to preclosing taxes. In addition, as we have noted, because the VAT receivables were classified under "other current assets," Acushnet did not pay any additional amounts for those assets as part of the postclosing working capital adjustment.[23] Acushnet then proceeded, postclosing, to collect nearly all of the VAT receivables from customers.[24] The net effect of Acushnet's interpretation, therefore, would be to hold Beam responsible for paying to the tax authorities the output VAT related to preclosing VAT receivables while barring it from recouping those amounts through the postclosing collection of the same VAT receivables. Such an interpretation is at odds with the over-all tax allocation structure of the transaction.

We accordingly conclude that the intent of the parties is not clearly expressed within the four corners of the contract

---

[23] Admittedly, this appears to have been a product of Acushnet's historical reclassification of VAT receivables and not an act undertaken for the express purpose of removing VAT receivables from the transaction due to any arguable relation to taxes.

[24] Acushnet had, at least by the time of trial, collected $15.54 million of the $16.62 million in VAT receivables.

and that, as a matter of law, section 8.01(b) is ambiguous in so far as it concerns postclosing rights to preclosing VAT receivables.

2. Findings at trial. What remains, therefore, is Acushnet's argument that certain subsidiary findings of the trial judge are clearly erroneous and therefore his ultimate finding as to the parties' intent with respect to the allocation of preclosing VAT receivables must be reversed. See M. O'Neil Supply Co. v. Petroleum Heat & Power Co., 280 N.Y. 50, 55-56 (1939) (when the language of a contract is ambiguous, it is for the fact finder to ascertain and give effect to the intention of the parties).

"To prevail on appeal on the basis of an assault on a judge's factual findings is no easy matter, for we accept the judge's findings of fact as true unless they are 'clearly erroneous.'" Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 636 (2010) (quotation omitted) (Millennium). We "do not review questions of fact if any reasonable view of the evidence and the rational inferences to be drawn therefrom support the judge's findings . . . [and we will] uphold the findings of a judge who saw and heard the witnesses unless we are of the definite and firm conviction that a mistake has been made." Martin v. Simmons Properties, LLC, 467 Mass. 1, 8 (2014) (quotation omitted).

"When a term or clause is ambiguous, the parties may submit extrinsic evidence as an aid in construction . . . ." Dobbs v. North Shore Hematology-Oncology Assoc., P.C., 106 A.D.3d 771, 772 (N.Y. 2013) (quotation omitted). For example, evidence may be submitted concerning "conversations, negotiations and agreements made prior to or contemporaneous with the execution" of the agreement, 67 Wall St. Co. v. Franklin Natl. Bank, 37 N.Y.2d 245, 248-249 (1975); the predispute conduct of the parties, Innophos, Inc. v. Rhodia, S.A., 38 A.D.3d 368, 375 (N.Y. 2007) (McGuire, J., concurring in part and dissenting in part), aff'd, 10 N.Y.3d 25 (2008); and industry custom and usage, see Reuters Ltd. v. Dow Jones Telerate, Inc., 231 A.D.2d 337, 343-344 (N.Y. 1997) (Reuters). Evidence concerning a party's uncommunicated subjective intent, however, is irrelevant. Nycal Corp. v. Inoco PLC, 988 F. Supp. 296, 302 (S.D.N.Y. 1997), aff'd, 166 F.3d 1201 (2d Cir. 1998). "The purpose of contract interpretation . . . is to determine the intentions of the parties . . . by examining [their] objective manifestations." Id. at 301.

Here, after a six-day trial at which the parties presented hundreds of exhibits and the testimony of numerous witnesses, the trial judge found that the parties' purpose was to include VAT receivables among the "amounts credited against or with respect to Taxes." This ultimate finding was soundly anchored

to several subsidiary findings, namely: (1) while the parties submitted the subjective interpretations of individuals involved in the underlying negotiation and drafting, there was no evidence of communications regarding section 8.01(b) beyond the exchange of drafts of the SPA; (2) there was no evidence that the phrase "amounts credited against or with respect to Taxes" is a term of art or that it has any recognized and accepted meaning as a matter of industry custom and usage; and (3) there was no evidence of any subsequent course of performance between the parties that would demonstrate a shared understanding of the disputed phrase. Moreover, the judge's interpretation of the contract is consistent with both (a) the division of tax liability and benefits under the SPA, and (b) the premise that a vendor or retailer will be left in a net zero position with respect to VAT.

Nonetheless, Acushnet claims that the trial judge did not understand what version of the contract was at issue. To support this argument, Acushnet points to the fact that the trial judge never quoted the final version of section 8.01(b) in his decision, but instead quoted from a draft of section 8.01(b) that was prepared by the buyer group, was never shared with Beam, and did not include the modifying language upon which Acushnet relies, which appears toward the end of section

8.01(b).[25]  All of this is true.[26]  The final version of section

8.01(b) and Acushnet's argument based on it, however, were not

lost on the trial judge, both having been addressed ad infinitum

at trial in various filings, by numerous witnesses, and in

Acushnet's closing brief and argument.  Throughout the trial,

the judge demonstrated that he had a firm grasp of the issues,

the language of the final version of section 8.01(b), and the

parties' respective contentions.  His comments during closing

arguments, referencing "credits . . . applied on a tax return,"

---

[25] As we have noted, that language provides that Acushnet was required to pay Beam "the amount of any such credit . . . within thirty (30) days after the filing of any Tax return in which the credit is used."

[26] The draft of section 8.01(b) quoted by the judge provided:

> "Any tax refunds that are received by or with respect to any [Acushnet] Company, and any amounts credited against or with respect to Taxes to which any [Acushnet] Company becomes entitled, that relate **solely** to any taxable year or portion thereof that ends on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date, shall be for the account of the Seller, and Buyer shall pay (or cause the relevant [Acushnet] Company to pay) over to the Seller any such refund or the amount of any such credit **actually received in cash** within ~~ten~~ **thirty** (~~10~~**30**) days after **the actual** receipt thereof [**] ~~or entitlement thereto~~, except to the extent Seller Group has an indemnification or payment obligation under this Agreement for such Taxes that has not been satisfied" (strikeout and emphasis original).

This version of the draft does not include the phrase appearing in the final draft at **:  "in the case of a refund, or within thirty (30) days after the filing of any Tax return in which the credit is used,".

in particular, demonstrate that he was basing his decision on the correct contract language.[27]  For these reasons, although the judge did not quote the correct contract language in his decision, we are not left with a "definite and firm conviction that a mistake has been committed."[28]  Millennium, 456 Mass. at 637 (quotation omitted).

Acushnet further argues that the trial judge erred when he discounted certain opinion testimony that the phrase "amounts credited against or with respect to Taxes" is limited to tax credits.  However, the judge was not required to accept the experts' testimony.  Evidence of industry custom and usage "is not admissible to influence the construction of a contract unless it appears that it be so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto.  That one party had knowledge of the usage, and supposed that it would enter into the contract, is not sufficient."  Reuters, 231 A.D.2d at 343-344 (quotation omitted).  Moreover, Acushnet's "expert" and

---

[27] The judge commented, "As I understand Beam's position, their position is that [section] 8.01(b) is not limited to tax credits that are applied on a tax return.  I understand if I agree with Acushnet on that point, then [Acushnet] should win." (Emphasis supplied.)

[28] Acushnet did not to seek clarification or reconsideration from the trial judge after he issued his decision.

"professional" witnesses' opinion testimony was imperfect at best. They had not seen the exact contract language used elsewhere; they could not identify other transactions in which they had seen the same phrase or term; and they acknowledged it was not a defined phrase under Generally Accepted Accounting Principles. In sum, the evidence of industry custom and usage was underwhelming and the trial judge, therefore, did not commit clear error by discounting it. It does not matter that the evidence was not rebutted. See McDonough v. Vozzela, 247 Mass. 552, 558 (1924) (judge "not bound to give credit to testimony even though uncontradicted").

Judgment affirmed.