NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

21-P-542

K.W.

vs.

LAZ PARKING LIMITED, LLC, & others.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff brought this action for civil liability after Jose Ruben Rivera, III, raped her in a hotel parking garage. The plaintiff asserted negligent security claims against three entities that either owned, managed, or advised the garage: JPA IV Management Company, Inc., as trustee of the John Philopoulos Associates Trust (JPA IV), JPA I Management Company (JPA I), and LAZ Parking Limited, LLC (LAZ).[2]  JPA I cross-claimed against LAZ alleging, among other things, that LAZ agreed to indemnify JPA I.  The plaintiff's claims against JPA I, JPA IV, and LAZ were tried to a jury, with the agreement

_____

[1] JPA IV Management Company, Inc., as trustee of the John Philopoulos Associates Trust, and JPA I Management Company, Inc.
[2] The plaintiff also asserted claims against Rivera and the hotel, but those claims are not at issue in this appeal, which is from a separate and final judgment that entered as to JPA I, JPA IV, and LAZ.

that the judge thereafter would decide LAZ's contractual indemnification obligations. Finding that JPA I and JPA IV, but not LAZ, were negligent, the jury awarded the plaintiff four million dollars in damages, and the judge concluded that LAZ did not have a contractual obligation to indemnify JPA I for the loss. JPA I appeals, arguing error in the judge's conclusion regarding LAZ's contractual indemnification obligations. We affirm.

Background. In the early morning hours of May 1, 2009, Rivera raped the plaintiff in a garage owned by JPA IV and managed by JPA I. The plaintiff entered the garage through the egress where motor vehicles could enter and exit, and Rivera entered through the same egress around the same time. In that location, there was also a sidewalk for pedestrian access. After entering the garage, both the plaintiff and Rivera took an elevator to the second floor, where Rivera pulled the plaintiff into a stairwell and raped her.

At trial, the plaintiff presented expert witness testimony that security in the garage did not meet the standard of care. The expert testified that security staffing was deficient, and that the garage should have taken better measures to prevent unauthorized access. The expert explained that the standard of care required a roll-up gate at the motor vehicle entrance to prevent pedestrians from using that entrance. In effect, this

2

would have required pedestrians to enter at the hotel lobby, where staff could have confirmed that they were garage patrons and inquired whether they wanted to be escorted to their vehicles.

Prior to the rape, LAZ pitched to JPA I the idea of taking over the management of the garage. JPA I did not feel comfortable with that but, recognizing that LAZ had a significant amount of experience and expertise managing garages,[3] hired LAZ as a consultant. On January 1, 2004, JPA I entered into an agreement with LAZ whereby LAZ agreed to advise and assist "on how to best manage, operate, direct, superintend and promote the use of the [garage]." Under the agreement, LAZ had specific, stated responsibilities: (1) developing a plan of operation, including "a system of tags, tickets or other method best designed to indicate the number of vehicles using the [garage] and [to] recommend parking rates," (2) "[m]ak[ing] recommendations on employing, discharging and supervising of all persons," (3) notifying of unusual conditions such as "fire, flood, breakage or casualty," and (4) performing a variety of services related to recommending and providing equipment. The

---

[3] LAZ was in the business of managing parking garages and, around the time of the rape, had approximately five thousand employees working in 1,300 locations.

agreement also contained the following indemnification provision:

> "[LAZ] agrees to indemnify and hold [JPA I] harmless against any and all claims for damages and any and all liability, loss and expense arising from damage or loss of property, including motor vehicles, and from injuries to persons, including death or damage to property, that arise from the conduct or actions of the servants, agents or employees of any person."

In exchange, JPA I agreed to pay LAZ four thousand dollars per month.

Discussion. The sole issue on appeal is whether the judge erred in concluding that LAZ did not have a contractual obligation to indemnify JPA I for the loss here. JPA I argues that the indemnification provision was a broad but unambiguous risk-transfer clause that required LAZ to bear the risk of all personal injuries or property damage sustained in the garage, regardless of who caused the loss. LAZ argues that the indemnification provision was ambiguous because a literal reading of it would have produced absurd results, and that the judge properly concluded that JPA I and LAZ did not intend for it to cover the loss here. We agree with LAZ.

Indemnification provisions "are to be interpreted like any other contract." Herson v. New Boston Garden Corp., 40 Mass. App. Ct. 779, 782 (1996). "To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the

4

drafting history or the intention of the parties." Biewald v. Seven Ten Storage Software, Inc., 94 Mass. App. Ct. 376, 380 (2018), quoting Bank v. Thermo Elemental Inc., 451 Mass. 638, 648 (2008). "Contract language is ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support [a] reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken" (quotation omitted). Suffolk Constr. Co. v. Lanco Scaffolding Co., 47 Mass. App. Ct. 726, 729 (1999). Accord Biewald, supra at 381. In making this determination, the court looks to the disputed language, "considered in the context of the entire contract rather than in isolation" (quotation omitted). Biewald, supra at 380. We review the judge's legal conclusion that the indemnification provision was ambiguous de novo. See id.

The broad language of the indemnification provision was inconsistent with -- and would have produced absurd results when viewed in light of -- the overall scope of the agreement. Read literally, the indemnification provision required LAZ to indemnify JPA I for losses having nothing to do with the garage whatsoever. For example, if a JPA I employee had negligently injured someone outside the garage, the broad language of the indemnification provision would have covered that scenario. The overall scope of the agreement, however, was much narrower than

5

that and required LAZ to perform a limited number of tasks related to the day-to-day operations of the garage. In light of this inconsistency between the broad language of the indemnification provision and the overall scope of the agreement, we conclude that the indemnification provision was ambiguous, and that the judge properly looked to extrinsic evidence to ascertain its intended effect. See Suffolk Constr. Co., 47 Mass. App. Ct. at 729. Cf. Department of Community Affairs v. Massachusetts State College Bldg. Auth., 378 Mass. 418, 427 (1979) (in statutory construction, resort to extrinsic aids appropriate where literal reading would produce absurd results).

JPA I's argument to the contrary -- that the indemnification provision was an unambiguous risk-transfer clause that required LAZ to bear the risk of all personal injuries or property damage sustained in the garage, regardless of who caused the loss -- is unavailing. The argument asks us to read some limiting language into the indemnification provision, i.e., that the loss be sustained in the garage, but assumes that JPA I and LAZ intended for LAZ to underwrite risks wholly unrelated to LAZ's responsibilities. We are not persuaded that JPA I and LAZ intended for LAZ, a mere consultant, to insure against all personal injuries or property damage sustained in the garage, where nothing in the remainder

6

of the agreement compels that conclusion.  Contrast Urban Inv. &

Dev. Co. v. Turner Constr. Co., 35 Mass. App. Ct. 100, 107-108

(1993) (intent of indemnification provision that included

insurance requirement was to transfer risk).

"Once a contractual ambiguity emerges, the meaning of the

uncertain provision becomes a question of fact for the trier."

Browning-Ferris Indus., Inc. v. Casella Waste Mgt. of Mass.,

Inc., 79 Mass. App. Ct. 300, 307 (2011).  The trier of fact may

consider "[e]xtrinsic evidence bearing upon the background and

purpose of the parties, as well as their understanding of the

meaning of particular language used in the contract."  USM Corp.

v. Arthur D. Little Sys., Inc., 28 Mass. App. Ct. 108, 116

(1989).  We review the judge's factual findings regarding the

parties' intent for clear error.  See Browning-Ferris Indus.,

Inc., supra at 307-308.[4]

---

[4] As noted, JPA I and LAZ agreed that the judge would decide
LAZ's contractual indemnification obligations after trial.  This
was purportedly done on JPA I's motion for summary judgment and
LAZ's motion for judgment as a matter of law, which ordinarily
would not permit the finding of facts.  However, the record is
clear that JPA I and LAZ asked the judge to decide the
contractual indemnification claim on the merits.  At a pretrial
conference, counsel for JPA I stated that JPA I was
"reserve[ing] [the contractual indemnification claim] for the
[c]ourt to determine."  The judge asked, "[Y]ou're not going to
have any particular witness examinations about the contractual
indemnity claim?"  Counsel for JPA I and LAZ both agreed.
Moreover, after the judge issued his decision and made factual
findings regarding the parties' intent, neither JPA I nor LAZ
submitted a motion for reconsideration arguing error in the

7

The judge found that JPA I and LAZ did not intend for the indemnification provision to cover the loss here, which arose from deficient security. This finding is supported by evidence showing that JPA I hired LAZ as a consultant to perform specific, stated responsibilities that did not include security. JPA I's own president provided deposition testimony that JPA I entered into a "consulting" agreement with LAZ whereby JPA I would pay LAZ a monthly fee and, in exchange, LAZ would help "find [a] garage manager," do "audit work" and "pricing surveys," "arrange[] parking contracts with monthly parkers," and similar work. The president of JPA I testified that security "wasn't specifically part of the arrangement" and that JPA I was responsible for keeping patrons safe in the garage. To that end, JPA I separately employed a director of security. While the president of JPA I also testified that he "would have hoped" that LAZ would volunteer security-related recommendations, "[e]vidence concerning [an] uncommunicated subjective intent is . . . irrelevant." Acushnet Co. v. Beam, Inc., 92 Mass. App. Ct. 687, 698 (2018).

Evidence regarding JPA I's course of conduct also shows that JPA I did not view LAZ's responsibilities as including security. See Browning-Ferris Indus., Inc., 79 Mass. App. Ct.

finding of facts. Therefore, any argument that the judge should not have made factual findings is waived.

8

at 309 ("There is no surer way to find out what parties meant, than to see what they have done" [quotation omitted]).  Shortly before Rivera raped the plaintiff, Rivera raped a JPA I employee in the garage.  Despite knowing about this prior rape, JPA I did not consult with or even inform LAZ of it.  As succinctly stated by the judge, "JPA I's actions in failing to consult LAZ about any possible precautions indicates quite clearly that JPA I believed that security was not in the bailiwick of LAZ."[5]

In sum, where JPA I hired LAZ as a consultant to perform specific, stated responsibilities that did not include security, there was no error in the judge's finding that JPA I and LAZ did

_____

[5] We are not persuaded by JPA I's argument that LAZ had responsibilities related to recommending and providing equipment, which JPA I argues included the sort of roll-up gate that may have prevented the rape.  LAZ's responsibilities in this regard pertained to the garage's day-to-day operations and included items such as time clocks.  Nothing in the agreement made LAZ responsible for notifying JPA I that that the absence of a roll-up gate made the garage unsafe.  Nor are we persuaded by JPA I's argument that LAZ did, in fact, perform security services by developing security-related signage.  JPA I cites a sign directing patrons on how to avoid property loss and suggesting that patrons consider being escorted to their vehicles.  While the sign had LAZ's logo on it, JPA I's director of security testified that the sign was his idea, and that LAZ's role was limited to providing a prototype.

9

not intend for LAZ to bear the risk of personal injuries arising from deficient security.[6]

<u>Judgment affirmed</u>.

By the Court (Wolohojian, Ditkoff & Walsh, JJ.[7]),

*Joseph F. Stanton*

Clerk

Entered:  March 31, 2023.

---

[6] Accordingly, we need not reach LAZ's alternative argument that the agreement was no longer in effect at the time of the rape.
[7] The panelists are listed in order of seniority.